Samuel A. Newman (SBN 217042)
sam.newman@sidley.com
Genevieve G. Weiner (SBN 254272)
gweiner@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: 213.896.6000
Facsimile: 213.896.6600


Attorneys for Creditor,
DBD Credit Funding LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | ) Case No. 2:19-bk-23823-VZ |
| | ) |
| TBH19, LLC, a Delaware limited liability company, | ) Chapter 11 |
| | ) |
| Debtor. | ) Assigned to: The Hon. Vincent P. Zurzolo |
| | ) |
| | ) **CREDITOR DBD CREDIT FUNDING LLC'S MOTION FOR AN ORDER FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | ) |
| | ) [Declarations of William Turner and Genevieve G. Weiner in support thereof; Application for Order Setting Hearing on Shortened Notice, filed concurrently herewith] |

ACTIVE 251701641v.4

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 2

     A.   The Debtor and Its Manager ................................................................. 2

     B.   The Property ........................................................................................... 3

     C.   Debtor's Loan from DBD ....................................................................... 4

     D.   Debtor's Consistent Failure to Manage its Financial Affairs ............... 6

          1.   Ross' Previous Bankruptcies and Appointment of Trustee ........... 6

          2.   Debtor's Multiple Events of Default Under the Loan Documents ....... 7

          3.   Debtor's Multiple Breaches Under the Loan Documents ............... 10

          4.   Debtor's Pattern of Falsehoods and Evasiveness in Pending Litigation
               with DBD ................................................................................... 11

III. ARGUMENT ................................................................................................... 13

     A.   The Standard for Appointment of a Chapter 11 Trustee ...................... 13

     B.   There Is Abundant "Cause" Within the Meaning of 11 U.S.C. § 1104(a)(1) to
          Warrant the Appointment of a Chapter 11 Trustee ............................... 16

          1.   Debtor's Gross Financial Mismanagement and Incompetence Mandate
               Appointment of a Chapter 11 Trustee ........................................ 16

          2.   Debtor's History of Dishonesty and Potential Fraud Further Warrant
               Appointment of a Chapter 11 Trustee ........................................ 17

     C.   Additionally, Appointment of a Trustee under 11 U.S.C. § 1104(a)(2) Is In the
          Interests of Creditors and the Estate ................................................... 18

          1.   The Debtor Cannot Be Trusted to Carry Out Its Fiduciary Duties ....... 18

          2.   Lender DBD Lacks Confidence in the Debtor ............................... 20

          3.   The Benefits of a Trustee Outweigh the Potential Costs ............... 21

IV.  CONCLUSION ................................................................................................. 22

ACTIVE 251701641v.4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bellevue Place Assocs.*,
    171 B.R. 615 (Bankr. N.D. Ill. 1994) ...................................................................14, 15

*In re Chochise College Park, Inc.*,
    703 F.2d 1339 (9th Cir. 1983) ..........................................................................15, 20

*In re Colorado-Ute Elec. Ass'n, Inc.*,
    120 B.R. 164 (Bankr. D. Colo. 1990) .........................................................................15

*Commodity Future Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985) .......................................................................................14, 20

*In re Corona Care Convalescent Corp.*,
    527 B.R. 379 (Bankr. C.D. Cal. 2015) ......................................................................15

*In re Deena Packaging Industries, Inc.*,
    29 B.R. 705 (Bankr. S.D.N.Y.) ..................................................................................18

*In re Evans*,
    48 B.R. 46 (Bankr. W.D. Tex. 1985) ........................................................................15

*In re Intercat, Inc.*,
    247 B.R. 911 (Bankr. S.D. Ga. 2000) .......................................................................13

*In re Johnson*,
    397 B.R. 486 (Bankr. E.D. Cal. 2008) ......................................................................21

*In re Morpheus Lights, Inc.*,
    228 B.R. 449 (Bankr. N.D. Cal. 1998) ......................................................................14

*In re Oklahoma Refining Co.*,
    838 F.2d 1133 (10th Cir. 1988) ..........................................................................14, 20

*In re Sharon Steel*,
    86 B.R. 455 (Bankr. W.D. Pa. 1988) ........................................................................14

*In re V. Savino Oil & Heating Co., Inc.*,
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ....................................................................14, 15

**Statutes**

11 U.S.C. § 101(31)(B)(vi) ................................................................................................18

11 U.S.C. § 1104(a) ...........................................................................................................13

ACTIVE 251701641v.4

11 U.S.C. § 1104(a)(1)..................................................................................................14, 16

11 U.S.C. § 1104 (a)(2)................................................................................................14, 19

Cal. Civ. Code. § 8460.....................................................................................................11

ACTIVE 251701641v.4

Creditor DBD Credit Funding LLC ("DBD") hereby files this Motion for and Order for Appointment of a Chapter 11 Trustee (the "Motion"). This Motion is based upon the attached Memorandum of Points and Authorities, the Declarations of William Turner and Genevieve G. Weiner filed concurrently herewith, the entire record in this case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Leonard Ross has been and continues to be a poor fiduciary and vexatious litigant seeking over and over to mislead creditors and this Court in his effort to endlessly delay the satisfaction of his legitimate obligations. Eight years ago, this Court replaced Ross with a chapter 11 trustee due to his lack of candor and failure to protect the interests of the estate under his charge. Since then, Ross has continued to dissemble and misrepresent and fail to satisfy his most basic obligations to his creditors. What's more, he now seeks to use the chapter 11 process and this Court to thwart legitimate creditor enforcement efforts, filing on the eve of a receiver being appointed over the Property.[1]

On the evening before Thanksgiving, Ross filed a slew of motions purportedly to address emergency needs of the estate. But this turned out to be another of Ross' games. Rather than seek to act in the best interests of the estate, Ross tried to sneak through a misrepresented insider transaction, lock the estate into a haphazard sale process not reasonably calculated to resolve the estate's obligations to its creditors, and obtain a blank check to use the creditors' collateral to fund a variety of insider payments. Ross' complete control over the Debtor in this case only exacerbates the many problems caused by his well-documented tendency for mismanagement and self-dealing.

DBD has ample experience with Ross' tactics, as the parties have already been embroiled

---

[1]    Capitalized terms used in this Introduction shall have the meaning provided *infra*.

1

1    in contentious litigation regarding the Loan since September of this year.[2]  In the State Court

2    Litigation, Ross has time and time again shown a willingness to act in stark violation of written

3    agreements in order to promote his own self-interest—going so far as to independently reduce

4    his rental obligations to Debtor from $3 million to $1.25 million per year – a nearly 60%

5    reduction.  This unilateral decision by Ross has jeopardized the Debtor's ability to service its

6    considerable debt.  Notably, the lease which Ross claims to have "amended" in this fashion

7    actually appears fraudulent from the start, as it is dated six months before the version of the lease

8    form used even existed.  In addition, Ross is seeking to pay himself exorbitant management fees

9    totaling over $2 million a year in exchange for his "services" which generated only $66,000 in

10    annual third-party revenues.   And worse yet it appears these limited revenues are being used by

11    Ross *not to maintain the collateral but to service debt on another one of his properties*.

12         Such instances of apparent fraud and self-dealing are unfortunately not exceptional

13    occurrences in dealings with Ross.  As described below, the record is replete with insider

14    transactions, unexplained transfers, intentionally omitted financial information, missing funds,

15    fabricated documents, and gross mismanagement of the collateral securing the over $53 million

16    owed to DBD and over $26 million claimed to be owed to another lender junior to DBD.  The

17    only way to protect the creditors' interests is the immediate appointment of an independent

18    fiduciary to oversee the administration of the estate and sale of the property securing the claims

19    of the estate's largest creditors.

20                    **II.    STATEMENT OF FACTS**

21         **A.    The Debtor and Its Manager**

22         The Debtor is a Delaware limited liability company managed by LMRTBH, LLC,

23    another Delaware limited liability company, which in turn is managed by Leonard M. Ross, an

24    individual ("Ross").  Ross completely controls and dominates the Debtor, so there is no one to

25    stop his mismanagement, self-dealing, and consistent lack of candor to courts and creditors alike,

---

[2]      The parties are involved in two separate lawsuits pending in California state court, Case No. 19STCV31137 (the "Guaranty Action") and Case No. 19STCV32941 (the "Borrower Action" and together with the Guaranty Action, the "State Court Litigation").

as discussed below.  One hundred percent of the membership interests in Debtor are indirectly held by the Leonard M. Ross Revocable Trust (u/d/t 12-20-85) (the "Ross Trust").  Ross is an investor and Chairman of the Board of Directors, President, Founder, Manager and beneficial owner of several closely held entities that have been involved directly and indirectly (through interests in closely-held partnerships) in various real estate activities and properties, including lodging, land development for estate homes, resort, office building, apartments, and shopping centers.

For decades, Ross, individually and through his entities, has engaged in complex real estate and related transactions.  Ross received a J.D. from UCLA School of Law in 1968, is a member of the California State Bar, and has been a licensed California Real Estate Broker since 1965. Ross is also Founder, Chairman and President, and beneficial owner of L.M. Ross PLC, a boutique law firm in Los Angeles, California, which is engaged in business and investment consulting.  Ross has been in the business of investing in real estate and securities for most of his professional life.

### B.    The Property

Debtor holds legal title to certain real property located at 1011 N. Beverly Drive, Beverly Hills, California, 90210 (the "Real Property" or the "Beverly House").  The Real Property, together with all personal property owned by Debtor or located on, used with, and/or appurtenant to the Real Property, as further described in the Trust Deed (as defined below), are collectively referred to herein as the "Property."

The Beverly House has a storied past.[3]  The residence is considered one of the crowning achievements of renowned architect Gordon Kaufmann and was built in 1927 for Milton Getz, Executive Director of the Union Bank & Trust Company.  In 1946, William Randolph Hearst and Marion Davies acquired and moved to the Beverly House from San Simeon, where Mr. Hearst lived until his death in 1951.  In 1953, then Senator John F. Kennedy and his wife,

---

[3]    Information about the Beverly House is publicly available at http://www.beverlyhouseestate.com/.

1    Jacqueline honeymooned at the Beverly House.  The Beverly House also has appeared in

2    multiple movies, including The Godfather, The Jerk, and The Bodyguard.

3        The Real Property is gated, has a gate house, and guest house, and includes

4    approximately 3.7 acres with original landscaping by Paul Thiene.  The Beverly House has a

5    50  foot entry hall with loggia, living room with 22-foot detailed ceilings, a library with hand-

6    carved woodwork, a billiards room, two projection rooms, formal dining room, breakfast room,

7    wine cellar, double master suites, four guest suites, four individual staff quarters, a total of

8    approximately 19 bedrooms and 29 bathrooms, a commercial kitchen, outdoor terrace seating for

9    400, an art-deco nightclub, a 7 bedroom guest house with its own tennis court, a gate lodge with

10    four bedrooms, a tennis court, waterfalls, ponds, and a swimming pool.

11        The Beverly House is fully furnished, including a cache of period furnishings, containing

12    substantial amounts of valuable artwork and tapestries, and other furnishings, fixtures, and

13    equipment.  The billiard room contains herringbone parquet floors and a massive carved stone

14    fireplace mantle from San Simeon.  All fixtures, furnishings, and equipment, as described in the

15    Trust Deed, secure the Loan and much of such collateral could easily be removed from the Real

16    Property.

17        Debtor advertises the Beverly House for lease for $600,000 per month and for $150,000

18    to $250,000 for private events, and the guest house alone rents for $85,000 per month.

19        **C.**      **Debtor's Loan from DBD**

20        In or around July 2015, the Debtor entered into negotiations with DBD Credit Funding

21    LLC ("Lender" or "DBD") for a loan to be secured by a lien on the Property.  Ross had extensive

22    involvement in these discussions, which lasted for months, and Ross heavily negotiated many of

23    the terms.

24        On or about December 23, 2015, Lender and the Debtor entered into a Loan and Security

25    Agreement (the "Loan Agreement"), pursuant to which Debtor obtained a loan from Lender in

26

27

28

the original principal amount of $40,000,000 (the "Loan"). Turner Decl. ¶ 3, Ex. A.[4]  In

connection therewith, the Debtor made, executed, and delivered to Lender a Promissory Note

dated as of December 23, 2015, in the original principal amount of $40,000,000 (the "Note").

Turner Decl. ¶ 5, Ex. B.

To secure payment of the Loan, including interest thereon and all other charges as

provided for in the Loan Agreement and the Note, Debtor made, executed and delivered to

Lender, among other things, (i) a Deed of Trust, Assignment of Leases and Rents, Security

Agreement and Fixture Filing (the "Trust Deed") encumbering the Property and other collateral,

as well as providing other rights relating thereto, (ii) an Assignment of Leases and Rents (the

"Rents Assignment") in which Debtor irrevocably granted and assigned to Lender all of its right,

title, and interest in and to all leases and rents arising from the Property, and (iii) a UCC

Financing Statement (the "UCC-1 Statement") securing Lender's interests in all of Debtor's

assets. Turner Decl. ¶ 6, Exs. C, D & E.  Such collateral includes valuable personal property.

As part of the Loan transaction, and to induce Lender to make the Loan to Debtor, Debtor

executed a Representation and Warranty Agreement for the benefit of Lender, in which Debtor

agreed, among other things, that (i) the Property would be used as an investment property,

(ii) the Property would only be used for commercial purposes, (iii) neither Debtor nor Ross

would claim the homeowners' exemption for property tax on the Property, and (iv) the Property

would not be used as a personal residence. Turner Decl. ¶ 7, Ex. F.

Pursuant to the Loan Agreement, DBD is entitled to information regarding the Beverly

House:

---

[4]    While DBD previously made certain standard assignments of the Loan Documents to other affiliated entities, DBD is currently the sole, lawful owner of the Note.  At all times while the Obligations under the Loan have been outstanding, Lender has been authorized to act on behalf of all successors and assigns that previously held an interest in the Loan.  *Id.* ¶ 8.  The Loan Agreement, Note, Trust Deed, Rents Assignment, UCC Statement, Representation and Warranty Agreement, and all other documents executed in connection with the Loan and/or that evidence, govern or secure the Loan, are referred to herein collectively as the "Loan Documents."  All capitalized terms not otherwise defined herein have the meanings ascribed in the Loan Documents.

- Debtor must allow inspections pursuant to Sections 7.5 and 9.6 of the Loan Agreement.

- Debtor is required to provide financial statements to an independent auditor to prepare balance sheets, income statements, and cash flow statements, pursuant to Section 5.1 of the Loan Agreement.

- Debtor must provide Rents and Receipts derived from the Property pursuant to Section 4 of the Assignment of Rents and Receipts.

- Debtor must provide copies of material notices it receives and inform Lender of any condition that constitutes an Event of Default or Technical Compliance Default as defined in the Loan Documents.

- Debtor must provide new or altered insurance policies to DBD for verification and approval that the scope of coverage complies with the Loan Agreement.

In violation of these contractual obligations, Debtor failed to provide information for 2018 and to date in 2019, last providing financial information as of September 2017 (over two years ago). Moreover, Debtor has not allowed DBD to inspect the Property since December 2018, despite multiple requests made by DBD.  And finally, in response to recent requests by DBD for verification of insurance coverage, Debtor belatedly provided multiple documents in various, conflicting forms—none of which fully complied with Debtor's requirements under Article X of the Loan Agreement.

**D.    Debtor's Consistent Failure to Manage its Financial Affairs**

During the past year, the Debtor and Ross have faced tremendous challenges maintaining the Property and paying the debts associated with it.  Indeed, the chapter 11 petition details over $135,000 of outstanding property taxes ($70,000 of which are past due and accruing penalties) and over $14,000 owed to utility companies.

**1.    Ross' Previous Bankruptcies and Appointment of Trustee**

Indeed, this is not the first time that Ross or his related entities has filed for bankruptcy. On September 15, 2010, Ross, in his individual capacity and as trustee for the Ross Trust, filed a

1    voluntary petition for bankruptcy under chapter 11.  Weiner Decl., Ex. Y.  At or around that

2    time, there were also bankruptcy proceedings pending for at least five other entities associated

3    with Ross (collectively referred to as the "Prior Ross Bankruptcy Cases").  Weiner Decl., Ex. Z.

4         The Prior Ross Bankruptcy Cases were precipitated in part by Bank of America's

5    issuance of a Notice of Default for Ross' failure to make a scheduled payment of over $900,000

6    on a loan with an unpaid principal balance of over $2 million.  In the Prior Ross Bankruptcy

7    Cases, Bank of America successfully moved for the appointment of a chapter 11 trustee.  Weiner

8    Decl., Ex. AA.  In ordering the appointment of a trustee, this Court found that Ross had

9    intentionally refused to disclose significant information; prepared inaccurate monthly operating

10   reports; failed to collect unpaid rent from an insider and non-insiders; refused to identify the

11   name of a lessee; was the subject of an unusually large number of avoidance actions concerning

12   fund transfers prior to Ross' bankruptcy filing; and had been involved with significant

13   irregularities with the maintenance of client trust accounts at Ross' law firm.  Weiner Decl.,

14   Ex. BB.  The Bankruptcy Court ultimately determined the "Debtor in possession unsuitable to

15   remain in a fiduciary capacity" and placed a chapter 11 trustee in control of the estate.[5]  Ross

16   eventually exited bankruptcy after confirmation of a plan proposed by the trustee.

17        **2.    Debtor's Multiple Events of Default Under the Loan Documents**

18        Pursuant to Section 9.1 of the Loan Agreement, several Events of Default have occurred

19   under the Loan, including Debtor's failure to pay a scheduled payment; failure to pay the

20   Obligations in full upon acceleration at the maturity of the Loan; failure to pay delinquent

21   property taxes; breach of Section 2 of the Representation and Warranty Agreement; and

22   frivolous denial of further liability under the Loan Documents. Turner Decl., Ex. A, §§ 9.1(A),

23   (B), (F), & (L); Turner Decl., Exs. G, H , I, K, L, M, R, S, T & U.  The Events of Defaults,

24   described below, are continuing, and Debtor has conceded the same in the State Court Litigation.

25   Debtor has made no attempt to cure any default. Turner Decl., ¶ 29.

26        **Failure to Pay Scheduled Payment**. On July 9, 2019, Ross failed to pay a Scheduled

27   _____

28   [5]    Weiner Decl., Ex. BB, page 30, ln. 14-15.

1    Payment on the date required under Section 2.3 of the Loan Agreement. Turner Decl. ¶ 10, Ex. A

2    § 2.3. Lender provided multiple written notices specifying the amount due and owing as

3    $808,955.27 plus a late fee of $40,447.76. Turner Decl., Exs. G, H, & I.

4        **Failure to Pay Property Taxes.** In late July 2019, Lender learned that Debtor had failed

5    to pay the property taxes for the Property for nine months. Turner Decl. ¶ 13. Debtor hid this

6    delinquency even though Debtor was obligated to inform Lender pursuant to Section 5.5 of the

7    Loan Agreement. *Id.* Lender gave Debtor notice of this Event of Default shortly after learning of

8    it from public sources, yet Debtor made no attempt to cure. Turner Decl., Ex. K. In fact, Debtor

9    admitted to failing to pay the property taxes in its complaint in the State Court Litigation,

10   cavalierly characterizing the past dues amounts as "a few thousand dollars," even though the

11   delinquent amount exceeds $70,000.00 and increases daily as a result of interest penalties.

12   Weiner Decl., Ex. CC ¶¶ 86-87.

13       **Failure to Pay the Accelerated Loan Amount**. On August 1, 2019, Lender gave notice

14   to Debtor that as a result of the prior Events of Default, the Loan had been accelerated pursuant

15   to Section 9.3 of the Loan Agreement, and therefore the entirety of the unpaid principal amount

16   of and the accrued interest and fees on the Loan and all other Obligations were immediately due

17   and payable. Turner Decl., Ex. K. Lender sent multiple letters throughout August detailing the

18   history of Debtor's Events of Default under the Loan Agreement and advising Ross of the full

19   amount due and owing under the Loan. Turner Decl., Exs. L, M & R. Debtor has not paid any of

20   the amounts due and owing, Turner Decl. ¶ 29, and has admitted the same in the State Court

21   Litigation. Weiner Decl., Ex. CC ¶¶ 86-87.

22       **Breach of Covenants Regarding Use of Property**. Notwithstanding the clear

23   prohibition on residential use in multiple sections of the Loan Documents,[6] Ross recently

24   _____

25   [6]    Pursuant to Section 4.7 of the Loan Agreement, Debtor represented and warranted "[t]he
     Loan is for commercial purposes, and not for residential, personal, household or consumer
26   purposes" and all leases and other material agreements relating to the use of the Property are to
     be disclosed to Lender. Turner Decl. ¶ 7, Ex. A § 4.7(D). Debtor also agreed that it "shall not
27   change the use of the Property from an investment property used for commercial purposes, and
     shall not, nor permit any other Person to, use the Property for personal, household or consumer
28   purposes." *Id.*, Ex. A at § 7.18. In the Representation and Warranty Agreement, Debtor

1    claimed to be living on the Property.  Debtor first admitted Ross was living in the Property in an

2    August 28, 2019 letter, referring to it as "Debtor's residence" and "castle" and claiming that

3    Lender's inspection of the Property would "violate Debtor's family life, privacy and his

4    residential tenancy rights under California law." Turner Decl., Ex. S.  Ross admitted again to

5    living on the Property in the State Court Litigation, as well as in multiple motions filed already in

6    this action. Weiner Decl., Ex. CC at ¶¶ 102-103.  Despite these clear admissions, there has never

7    been any indication (from Lender's previous inspections or otherwise) that Ross, or anyone else,

8    was residing at the Property. Turner Decl. ¶ 22. In fact, Ross expressly told Lender's

9    representative, Mr. Turner, that he was not living at the Property and knew that he was not

10   allowed to do so under the Loan Documents. *Id.*

11       On September 3, 2019, Lender reminded Debtor, in writing, that Debtor and/or its

12   Manager, Ross is not permitted to reside in the Property, that doing so constitutes an Event of

13   Default, and, to the extent "anyone else is living at the Property," Ross must "provide the Lender

14   with the lease or other contracts memorializing any such arrangement." Turner Decl. ¶ 24, Ex. U.

15   Debtor has not responded to the September 3, 2019 letter and also has not provided any leases or

16   any Rents or Receipts to DBD. Turner Decl. ¶ 24.

17       **Denial of Liability Event of Default**. Pursuant to Section 9.1 of the Loan Agreement, an

18   Event of Default occurs when Debtor denies any further liability under the Loan Documents.

19   Turner Decl., Ex. A § 9.1. In communications dated August 28 and 29, Debtor denied any

20   obligation to pay the amounts due and owing, *id.*, Exs. S & T, and on September 20, 2019,

21   Debtor filed an 83-page complaint doubling down on its position that it was not required to repay

22   to Lender the over $53 million in principal, interest, and other Obligations due and owing.

23   Weiner Decl., Ex. CC.  This constitutes yet another Event of Default.

24

25

26   covenanted and agreed that "Debtor shall own the Property as an investment property and use the
     Property for commercial purposes only, including, inter alia, leasing the Property for filming,
27   corporate events and charitable events" and that the "Property shall not be use as a personal
     residence." *Id.*, ¶ 7, Ex. F § 2(a).
28

### 3.    Debtor's Multiple Breaches Under the Loan Documents

In addition to the Events of Default described above, Debtor is also currently in breach of several provisions of the Loan Documents.

**Refusal to Allow Inspection of the Property.**  Following the occurrence of the Events of Default, on August 21 and 23, 2019, Lender provided notice of its intent to inspect the Property. Turner Decl., Exs. N & Q.  Debtor refused to allow Lender access to the Property, claiming first that the timing of the notice was insufficient and later challenging Lender's right to enforce the Loan and denying Debtor's further obligations under the Loan. Turner Decl., Exs. O & P.  Lender is clearly entitled to such inspection under the Loan Agreement.[7]  Prior to the Events of Default, Lender had regularly inspected the Property with Ross' permission, and Ross had never before claimed that Lender was not entitled to enforce the Loan. Turner Decl. ¶ 18. However, instead of complying with its obligations under the Loan, Debtor threatened to call the police if Lender exercised its right to enter the Property. Turner Decl., Ex. S. To date, Debtor has not allowed any inspection. Turner Decl. ¶ 22. As a result, Lender has no way of ensuring that its Collateral is being preserved, and Ross' conduct raises serious concerns that the collateral is in jeopardy.

**Failure to Provide Rents and Receipts Derived from the Property.**  On August 27, 2019, Lender demanded that Ross pay to Lender all Rents and Receipts derived from the Property pursuant to Section 4 of the Assignment of Rents and Receipts. Turner Decl.  21, Ex. R. As of the date of the filing of this Motion, Ross has not responded or turned over any Rents and Receipts. Turner Decl. ¶ 21.

**Allowing a Mechanic's Lien to be Recorded on the Property**.  On July 25, 2019, Creditor Reynoso recorded a Mechanic's Lien in the amount of $16,500 as Instrument No. 2019-

---

[7]    Pursuant to Sections 7.5 and 9.6 of the Loan Agreement, Lender has the right to "visit and inspect the Property and its businesses" and to "enter and to authorize others to enter upon the Property or any part thereof for the purposes of (i) inspecting the Property and conducting appraisals, (ii) determining whether Debtor has performed its obligations under the Loan Documents, (iii) protecting Lender's interests in the Collateral, (iv) performing or attempting to perform any obligation of Debtor, (v) responding to any Default or Technical Compliance Default, and (vi) collecting any Receipts and performing any obligations under any Leases in the event of an Event of Default." Turner Decl., ¶ 3, Ex. A §§ 7.5, 9.6.

733032, in the Official Records for Los Angeles County, California, encumbering the Real

Property. Turner Decl., Ex. J. This is a Technical Compliance Default under Section 9.2 of the

Loan Agreement.[8]

**Threatening to Sell the Property.** On September 11, 2019, Ross indicated he was in

discussions to sell the Property, and provided no assurance that Debtor would follow appropriate

procedures or use the proceeds to pay Lender in connection with any such sale. Turner Decl.,

Ex. W.

**Failure to Provide Financial and Other Required Information**. The Loan Agreement

contains numerous provisions requiring the Debtor to provide information to Lender, and Debtor

has failed to do so in several respects. Pursuant to Section 5.1(B), Debtor is required to provide

balance sheets, income statements, cash flow statements, and audited property-level financial

statements prepared by an independent auditor to Lender. Turner Decl., Ex. A. However, Debtor

stopped providing the information to the independent auditor necessary to prepare audited

property-level financial statements. Turner Decl. ¶ 30. Debtor also is required to provide copies

of material notices it receives and inform Lender of any condition that constitutes and Event of

Default or Technical Compliance Default. Turner Decl., Ex. A §§ 5.4, 5.5. Debtor has not

informed Lender of any of the circumstances described above, including the property tax

delinquency and the recording of a Mechanic's Lien, leaving Lender to learn about situations

long after the fact through its own investigation. Turner Decl., ¶¶ 12, 13 & 30.

### 4. Debtor's Pattern of Falsehoods and Evasiveness in Pending Litigation with DBD

On September 3, 2019, Lender commenced the process for a non-judicial foreclosure sale

and caused a Notice of Default and Election to Sell Under Deed of Trust ("Notice of Default"),

to be recorded as Instrument No. 20190894706 in the Official Records for Los Angeles County.

Turner Decl. ¶ 25, Ex. V.   After learning of the Notice of Default, Debtor commenced the

Borrower Action against Lender and related parties, alleging sixteen separate causes of action.

---

[8]    DBD contends the Mechanic's Lien is invalid as a result of the claimant's failure to enforce the lien within 90 days of it being recorded.  Cal. Civ. Code. § 8460.

Weiner Decl., Ex. CC.  In its complaint, Debtor denied any further obligations under the Loan, baselessly characterizing Lender and other parties as "rapacious creditors," "corrupt, greedy people […] driven by their greed and desire to possess […] his family's legacy Property." *Id.* Debtor admitted to various breaches of the Loan Agreement, including living on the Property despite the clear prohibition of Section 4.7, but defended on the theory that Lender had made certain vague representations to Debtor, contrary to the written terms of the Loan Documents, and then was reneging on such representations by enforcing the terms as written.  Debtor supplied little evidence in support of this theory, other than his own personal representations and conjecture.

On September 23, 2019, Lender filed a Cross-Complaint in the State Court Litigation, seeking appointment of a receiver and commencing judicial foreclosure (the "Receiver Motion"). Weiner Decl., Ex. DD.  Debtor's Opposition to the Receiver Motion was riddled with falsehoods and altogether bereft of any credible basis to prevent appointment of a receiver.  Weiner Decl., Ex. EE.  For example, Debtor falsely claimed, as he does again in the present action, that the Property generates $600,000 per month in rental income.  Yet only $66,000 of this comes from non-insiders.  Furthermore, Debtor has provided no proof whatsoever of any of this rent actually being paid.  In addition, Debtor attempted to justify Ross living on the Property with a purported "lease" that Debtor, as landlord, had entered into with Ross, as tenant.  *Ross signed on behalf of both parties*.  This insider lease appears to have been fabricated, or at least created long after it was dated – the lease referenced by Ross was dated January 1, 2017, but per the footer at the bottom left of each page, the pre-printed lease form he used did not exist until June 2017, six months after it was purportedly entered into.  Weiner Decl., Ex. FF.  The lease form could not have been contemporaneously dated January 1, 2017, and the purported lease could not have commenced on that date.

This purported lease would allow Ross to reside on the Property for $250,000 a month, substantially below the $600,000 market rate and thereby evidencing improper self-dealing. Moreover, Ross also provided an Amendment to the fabricated lease in which the lease payment

was conveniently *decreased by almost two thirds* from $3 million to $1.25 million per year.

Weiner Decl., Ex. FF.  Assuming Ross even paid this rent, this self-serving Amendment

drastically reduced the cash available to maintain the Property and pay Debtor's substantial

debts, and it did so for Ross' personal benefit.  Finally, financials submitted to the Court by

Debtor revealed that significant revenue from the Property was being used to pay debt service on

another property owned by Ross.[9]  Such payments not only violate the terms of the Loan

Agreement, but also provide clear evidence of Ross' prioritization of his own self-interest above

the financial well-being of the Debtor.

This tangled web of insider transactions, combined with Debtor's continued lack of

candor towards the courts and its creditors, caused the junior lender on the Property, HAR-BD,

LLC, to join in support of Lender's Receiver Motion.  Oral argument on the Receiver Motion

was set for Tuesday, November 26, 2019 and was subsequently cancelled after Debtor filed for

bankruptcy on the evening of Sunday, November 24, 2019.

### III.    ARGUMENT

### A.    The Standard for Appointment of a Chapter 11 Trustee

While there is generally a presumption that the debtor is entitled to remain in possession

during a chapter 11 case, section 1104(a) of the Bankruptcy Code provides for – and in some

cases mandates – the appointment of a trustee under certain facts and circumstances.  *See, e.g.*, *In

re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) ("[I]n the appropriate case, the

appointment of a trustee is a power which is critical for the Court to exercise in order to preserve

the integrity of the bankruptcy process and to insure that the interest of creditors are served").

The Supreme Court has explained that "[t]he willingness of courts to leave debtors in possession

'is premised upon an assurance that officers and managing employees can be depended upon to

---

[9]    The notes of the 2017 independent audit indicate that for seemingly no consideration, Borrower was diverting $1,320,559 from the Property to pay debt service on a neighboring property (1013 North Beverly) in which Ross has an interest. The financials also appear to indicate that $2.79 million in lease revenue was paid in FYE 2017 to the owner of the 1013 property. This violates Sections 7.13 (barring additional Indebtedness) and 7.19 (barring transactions with Related Persons) of the Loan Agreement.  Turner Decl., Ex. X.

carry out the fiduciary responsibilities of a trustee." *Commodity Future Trading Comm'n v. Weintraub*, 471 U.S. 343, 335 (1985) (quoting *Wolf v. Weinstein*, 372 U.S. 633, 649-652 (1963). When there is doubt that the debtor's management can fulfill this responsibility, the appointment of a trustee is the appropriate remedy. *See, e.g., In re Morpheus Lights, Inc.*, 228 B.R. 449, 454 (Bankr. N.D. Cal. 1998) ("the proper remedy of a creditor when confronted with a debtor in possession who declines to perform fiduciary duties […] is to petition for appointment of a trustee").

Section 1104(a)(1) provides that the Court *shall* order the appointment of a chapter 11 trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." 11 U.S.C. § 1104(a)(1). Once the Court has found that "cause" exists under section 1104, the Bankruptcy Code mandates the appointment of a trustee. *See In re V. Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 525-26 (Bankr. E.D.N.Y. 1989) ("Once a court has found that cause exists under § 1104(a)(1); there is no discretion; an independent trustee must be appointed"). The list of examples in section 1104(a)(1) is not exhaustive and, in practice, the standard for appointment of a trustee for cause is quite flexible, resting  "within the discretion of the court [based on] various interests involved in the bankruptcy proceeding." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994).  The Court may consider both pre-petition and post-petition activity. *See In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) (citing *In re Main Line Motors*, 9 B.R. 782 (Bankr. E.D. Pa 1981)). "Cause" is frequently found to exist where there is "gross mismanagement and incompetence." *In re Sharon Steel*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988) (finding appointment of a trustee mandatory due to, among other reasons, conclusive evidence of self-dealing and failure to adequately track month-to-month profits); *See In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("failure to keep adequate records and make prompt and complete reports justifies appointment of a trustee").

Additionally, subsection (a)(2) allows the court to appoint a trustee, in the absence of

1    cause, "if such appointment is in the interests of creditors, any equity holders, and other interests

2    of the estate". 11 U.S.C. § 1104 (a)(2).  The court has "particularly wide discretion" to order

3    such appointment, even absent wrongdoing or mismanagement.  *In re Bellevvue Place Assocs.*,

4    171 B.R. 615, 623 (Bankr. N.D. Ill. 1994).  In determining which option is in the best interest of

5    creditors, the court evaluates the prospects for collection and payment of the claims of creditors.

6    *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015).  The

7    traditional factors used to determine whether appointment of a chapter 11 trustee is in the best

8    interest of the creditors include: (1) the debtor's trustworthiness; (2) the debtor-in-possession's

9    past and present performance and prospects for the debtor's rehabilitation; (3) confidence—or

10   lack thereof—of the business community and of creditors in present management; and (4)

11   benefits derived by the appointment of a trustee to balance against the costs of appointment.  *See,*

12   *e.g., In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990); *In re*

13   *Evans*, 48 B.R. 46 (Bankr. W.D. Tex. 1985) (applying substantially similar factors).

14          A debtor-in-possession in a chapter 11 case has the same fiduciary duties to its creditors

15   as a trustee appointed by the court.  *In re Cochise College Park, Inc.,* 703 F.2d 1139 (9th Cir.

16   1983).  Importantly, the debtor-in-possession owes fiduciary duties of both care and loyalty to all

17   of its creditors and equity holders.  *In re Bellevue Place Assocs.*, 171 B.R. 615 (Bankr. N.D. Ill.

18   1994).  The duty of loyalty includes the duty not to engage in self-dealing, meaning that the

19   debtor-in-possession may not act solely in its self-interest to the exclusion of the other interests

20   which the debtor-in-possession has the fiduciary duty to protect.  *In re Bellevue Place Assoc.*,

21   171 B.R. 615, 623 (Bankr. N.D. Ill. 1994).  Failure to disclose material and relevant information

22   to the Court and creditors requires appointment of a trustee.  *In re V. Savino Oil & Heating Co.,*

23   *Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[o]pen, honest and straightforward disclosure to

24   the Court and creditors is intrinsic to the entire reorganization process and begins on day one,

25   with the filing of the Chapter 11 petition").

26

27

28

**B.**    **There Is Abundant "Cause" Within the Meaning of 11 U.S.C. § 1104(a)(1) to Warrant the Appointment of a Chapter 11 Trustee**

      **1.**    **Debtor's Gross Financial Mismanagement and Incompetence Mandate Appointment of a Chapter 11 Trustee**

Debtor's history with the Property demonstrates a consistent inability to pay its debts and to manage the affairs of the Property, notwithstanding the substantial gain in value Ross has realized over the last 40 years.  Ross and his entities and assets, including the Beverly House, have been involved in six separate bankruptcy proceedings in the last 10 years.  Having learned nothing from this experience, Ross has yet again allowed the Property to become burdened by various liens—in violation of the Loan Agreement—including a lien by a mechanic and liens by the Los Angeles County Tax Collector for failure to pay property taxes.  These are, of course, in addition to the over $53 million owed to Lender and secured by the Property, with respect to which Debtor has failed to make numerous required payments and for which the entire balance is now due and owing.

Importantly, Debtor actively concealed these unauthorized additional liens on the Property, leaving Lender to discover through public sources.  And Debtor has failed to disclose, and still fails to disclose, various documents reasonably requested by Lender to further assess the wellbeing of the Collateral—such as information regarding the leases and other financial reporting documents required under the Loan Documents.  These failures, in addition to other Events of Default, have resulted in the Loan's acceleration and the imposition of hundreds of thousands of dollars in penalty fees and interest.  Debtor's mismanagement is underscored by the Property's failure to generate a meaningful amount of non-insider revenue.  Although Ross has withheld evidence of recent payments and performance, remarkably, the financials last provided by Debtor show under $70,000 in third party revenue, illustrating that Debtor is either not trying or is completely failing to rent the property.

Indeed, Debtor has not provided any evidence to Lender concerning current revenues or demonstrating how Debtor would able to pay the substantial costs associated with the Property in the absence of insider rent, and he has not even demonstrated that the insider rent was paid.

Moreover, despite the cash needs of the Property, Ross reduced his annual rent obligation from $3 million to $1.25 million only 8 months after entering into the purported lease agreement between Ross and Debtor (which was signed by Ross on behalf of himself and the Debtor).  In the State Court Litigation, Debtor has provided documents indicating that revenue from the Property was used to pay debt service on another property owned by Ross.  Due to this mismanagement and self-dealing, the Property likely continues to operate at a loss, as reflected in the last financials provided by Debtor, ensuring Debtor's inability to make necessary payments to preserve Lender's Collateral.

In sum, Debtor's behavior rises to a level of gross financial mismanagement and/or incompetence, which requires appointment of a trustee.

### 2.    Debtor's History of Dishonesty and Potential Fraud Further Warrant Appointment of a Chapter 11 Trustee

Debtor's dishonest and seemingly fraudulent conduct show that it cannot be entrusted with ongoing management of the Property as a fiduciary for creditors.

As noted above, Debtor actively concealed from Lender the various liens filed against the Property in violation of the Loan Documents, leaving Lender to discover Debtor's conduct on its own through public sources.  Debtor now claims to have no further obligations under the Loan, arguing it does not have to repay the over $53 million owed and going so far as to file a baseless complaint *against Lender* in the State Court Litigation.  Recently, Debtor claimed that he has been living at the Property—his so-called family compound—for over 40 years, despite having warranted in 2015 that nobody had lived at the Property for years and covenanted he would not do so during the life of the Loan.  Indeed, Ross confirmed to Lender at an inspection less than a year ago that he was not living at the Property and knew he could not do so based on the Loan Documents.

Furthermore, as discussed above, Debtor resorted to manufacturing a self-serving lease in support of Ross' purported ability to reside on the Property.  As an exhibit to his declaration opposing appointment of a receiver, Ross put forth a so-called "Residential Lease or Month-to-

Month Rental Agreement" signed by Ross as tenant and as landlord dated January 1, 2017; yet

the lease form Ross used did not exist until June 2017, six months after it was purportedly

entered into.  Accordingly, the lease form could not have been dated January 1, 2017, and the

purported lease could not have commenced on that date.  Notably, this lease purported to allow

Ross to live on the Property for $250,000 per month, substantially below the market rate of

$600,000.  Despite such favorable terms, Ross proceeded to amend this fabricated lease,

seemingly of his own accord, to reduce his rent obligation from $3 million to $1.25 million

annually—again without explanation.  And in declarations and motions in this current case,

Debtor has declared that Ross' brother is "disinterested," despite clearly meeting the definition of

an "insider" under 11 U.S.C. § 101(31)(B)(vi);[10] that the Property is worth $125,000,000 based

solely on Ross' "opinion"; and that some undefined "emergency" justifies an expedited hearing

without any evidence in support thereof.  Lender is confident that the documents that Debtor has

refused to turn over contain additional examples of misconduct and self-dealing by Debtor:  if

Ross had nothing to hide, surely he would have produced more than a year's worth of financial

information.

 The Debtor's dishonest and misleading statements, including in official declarations

submitted to this Court, coupled with his well-documented financial mismanagement and gross

incompetence, also supports appointment of a Chapter 11 Trustee.  *See In re Deena Packaging*

*Industries, Inc.*, 29 B.R. 705, 706-708 (Bankr. S.D.N.Y.) (cause to appoint a trustee existed

where debtor failed to include relevant financial data in the petition and schedules, raising

"questions of dishonest conduct").

**C.     Additionally, Appointment of a Trustee under 11 U.S.C. § 1104(a)(2) Is In the Interests of Creditors and the Estate**

**1.     The Debtor Cannot Be Trusted to Carry Out Its Fiduciary Duties**

This is not the first time Ross has filed for Bankruptcy, nor is it the first time a creditor

---

[10]     Debtor filed a motion seeking to engage Ross' brother as a broker for the Real Property,
D.I. 25, but proceeded to withdraw this motion just a few days after filing, perhaps in recognition
of its blatant inappropriateness.

has moved for appointment of a chapter 11 trustee.  In granting a creditor's motion for

appointment of a chapter 11 trustee in Ross's previous bankruptcy proceeding, this Court found

Ross "unsuitable to remain in a fiduciary capacity" due to, among other things, refusals to supply

necessary documents and inaccuracies in documents actually supplied.  As in the prior

bankruptcy proceeding, Debtor is yet again refusing to turn over crucial paperwork as obligated

under the Loan Documents.  Debtor refuses to provide financial reporting required under Section

5.1 of the Loan Agreement; refuses to provide or describe the leases for the Property, including

the lease that purportedly allows Debtor to live at the Property in breach of the Loan Agreement;

and altogether denies any obligation under the Loan.

Lender's distrust in Debtor's ability to act as a proper fiduciary, including the duty to

avoid conflicts of interest, has been compounded by startling revelations within Debtor's

petition.  The petition reveals that Debtor has been paying Ross an exorbitant annual

management fee of *almost $2 million* in exchange for Ross paying below market rent and

generating less than $70,000 in third-party event receipts – there can be no dispute that such an

arrangement is a bad deal for the Debtor and its creditors.[11]  For all the rent that Debtor claims as

revenue generated by the Property, Lender believes there is no material cash actually coming

into the estate.  The petition reveals that in 2017, $3 million of the revenue was generated from

related party leases (*i.e.* Ross) and only *$66,000 was from third parties*.  Debtor has not provided

any evidence of these rental payments, so Lender remains entirely unable to confirm they have

even been paid.  Furthermore, the petition lists at least two apparent insider creditors of which

Lender was previously unaware: Chimney Hill Properties, Ltd. and Merri Jean Ross, owed over

$7 million and $300,000, respectively.  Lastly, it is not even clear that Ross had proper authority

to file for bankruptcy without consent of Debtor's Independent Manager.[12]  ***Ross cannot be***

---

[11]    As noted previously, Ross' purported rental payments are substantially below market value according to Debtor's own papers, further evidencing Ross' tendency for self-dealing.

[12]    Debtor's operating agreement states that Debtor may not "file a petition seeking […] reorganization or relief under any applicable federal or state law relating to bankruptcy" without "the prior affirmative vote or written declination of the Independent Manager"  Section

1    ***permitted to continue this self-dealing.***

2        All of these facts above give ample reason for Lender's grave concern as to Ross' ability

3    to carry out his fiduciary duties towards the Estate.  Among other duties, a Debtor's fiduciary

4    duty of loyalty to the Estate requires it to refrain from self-dealing and treat all parties fairly.

5    *See, e.g., In re Chochise College Park, Inc.,* 703 F.2d 1339, 1357 (9th Cir. 1983); *Commodity*

6    *Future Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).  Here, the complex

7    involvement of Ross' various related entities; the evidence of self-interested benefit to Ross'

8    entities at the expense of other creditors; and the existence of insider creditors with substantial

9    claims all point towards serious conflicts of interest and potential self-dealing.

10        Indeed, in the State Court Litigation, Debtor has provided documents indicating that

11    revenue from the Property was used to pay debt service on another property owned by Ross.  So

12    not only does Lender have ample cause for concern here as to the *possibility* of self-serving

13    transactions, but Debtor has already demonstrated its willingness to engage in such self-interest

14    in plain view of the court.  An independent trustee must be appointed where, as here, a debtor

15    and/or its management and insiders suffer(s) from material conflicts of interest and cannot be

16    trusted to properly and fairly distribute the assets of the Estate.  *See, e.g.*, *In re Oklahoma*

17    *Refining Co.*, 838 F.2d 1133 (10th Cir. 1988) ("a history of transactions with companies

18    affiliated with the debtor company is sufficient cause for the appointment of a trustee where the

19    best interests of the creditors require").

20            **2.**      **Lender DBD Lacks Confidence in the Debtor**

21        Debtor and Lender have already been embroiled in contentious litigation regarding the

22    Loan.  After Lender issued the Notice of Default, Debtor filed suit against Lender and other

23    related parties alleging sixteen separate causes of action and altogether denying any further

24    obligation under the Loan.  Amongst 83 pages of rambling hyperbole, Debtor referred to his

25    "rapacious creditors" as "corrupt, greedy people" who had made and then rescinded various

26

27    11.01(a)(xxxi).  Debtor provided no evidence of any such consent, as Ross was the only one to
sign on Debtor's behalf.

28

1    assurances not to adhere to certain written provisions in the Loan Documents to which Ross had

2    previously agreed.  Debtor proceeded to oppose Lender's attempt to appoint a receiver, even

3    though such appointment is authorized upon the occurrence of an Event of Default per the Trust

4    Deed.  Rationalizing its decision to appoint a trustee, the Eastern District of California

5    Bankruptcy Court noted that "the warring parties were so enmeshed in intertwined disputes that

6    further progress towards a confirmable plan of reorganization required that a neutral party be at

7    the helm." *In re Johnson*, 397 B.R. 486, 488 (Bankr. E.D. Cal. 2008).  This is precisely such a

8    case, where Debtor and DBD have been unable to come to amicable resolution of related

9    disputes due to Debtor's steadfast stance that the written language of the Loan Documents are

10   not worth the paper they are written on.

11       Furthermore, DBD is not the only creditor to have lost trust in the Debtor.

12   HAR-BD, LLC and certain affiliated entities (the "Bookstein Entities"), who assert a junior

13   secured claim against the Debtor, have informed DBD that they also support the appointment of

14   a chapter 11 trustee.  The Bookstein Entities similarly supported DBD's Receiver Motion in the

15   State Court Litigation after Debtor put forth a number of self-serving, misrepresentative, and

16   false filings.  It appears that history is beginning to repeat itself here and appointment of a trustee

17   is necessary – as it was in 2011 – to provide creditors with the reassurance that a fair and

18   independent fiduciary is finally managing the Debtor and properly safeguarding the Property.

19   Appointment of a trustee will enable an efficient and equitable resolution of this case for all

20   parties in interest.

21                   **3.        The Benefits of a Trustee Outweigh the Potential Costs**

22       As explained above, Lender has serious concerns about the actions taken by the Debtor

23   prior to the filing of the petition and about the Debtor's ability to fulfill its fiduciary duties to

24   creditors.  It is imperative that control of the Property be vested in a party who has both the

25   ability to manage the Property in a financially responsible manner and fulfill the fiduciary

26   obligations owed to the Debtor's creditors – and this is clearly not Ross.

27       Furthermore, there is absolutely no harm to the Debtor's operations or finances that

28

ACTIVE 251701641v.4

1   would be caused by the appointment of a trustee.  The Debtor's sole business is renting out the

2   large real estate complex known as the Beverly House for a variety of commercial and

3   entertainment activities.  The business is not complicated nor does it require unique input from

4   Ross.  A chapter 11 trustee could easily step in to market the property for rent and for sale with

5   very little lost in the transition—and for much less cost to the estate than Ross is currently

6   siphoning off as "management fees."  Under Ross' stewardship, the Property has failed to

7   generate any meaningful revenue, and Ross saw fit to pay himself nearly $2 million annually.

8   An independent trustee is more than capable of taking over Ross' management duties at a

9   drastically reduced cost to the estate.

10        Lender urges this Court to immediately appoint a trustee to preserve whatever estate

11   value remains for the benefit of all creditors.  While Lender is mindful of the additional costs that

12   are associated with the appointment of a trustee, Lender believes that the loss to the Estate that

13   will occur if Ross is allowed to remain in control of the Debtor and the Property will far

14   outweigh the costs of a trustee.

### IV.    CONCLUSION

16        For the reasons described above, DBD respectfully requests that this Court grant the

17   Motion and immediately appoint a chapter 11 trustee for the benefit of all creditors and parties in

18   interest.

DATED: December 4, 2019

Respectfully submitted,

SIDLEY AUSTIN LLP

By:*/s/ Samuel A. Newman*
    Samuel A. Newman
    Genevieve G. Weiner

Attorneys for Creditor,
DBD Credit Funding LLC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Sidley Austin LLP, 555 West Fifth Street, Suite 4000, Los Angeles, CA 90013

A true and correct copy of the foregoing document entitled (*specify*): __CREDITOR DBD CREDIT FUNDING LLC'S MOTION FOR AN ORDER FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF__ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On December 4, 2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☑    Service information continued on attached page

**2.    SERVED BY UNITED STATES MAIL**:
On December 4, 2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge __will be completed__ no later than 24 hours after the document is filed.

☑    Service information continued on attached page

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on December 4, 2019, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge __will be completed__ no later than 24 hours after the document is filed.

☑    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 12/4/2019 | Pamela Santos | /s/Pamela Santos |
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

ACTIVE 251467009

## SERVICE LIST

| Via ECF Notice | |
|---|---|
| James Andrew Hinds | jhinds@jhindslaw.com, mduran@jhindslaw.com |
| Daviel A. Lev | dlev@sulmeyerlaw.com, asolokowski@sulmeyerlaw.com, dlev@inforuptcy.com, dwalker@sulmeyerlaw.com |
| Kelly L. Morrison | kelly.l.morrison@usdoj.gov |
| David B. Shemano | dshemano@shemanolaw.com |
| Rachel M. Sposato | rsposato@jhindslaw.com, mduran@jhindslaw.com |
| United States Trustee | ustpregion16.la.ecf@usdoj.gov |
| Robert M. Yaspan | court@yaspanlaw.com, tmenachian@yaspanlaw.com |
| **Via U.S. First Class Mail** | |
| Debtor:<br>TBH19, LLC<br>269 S. Beverly Drive, Suite 1075<br>Los Angeles, CA 90212 | Law Office of David Giles<br>10440 N. Central Expressway<br>Dallas, TX 75231 |
| James Andrew Hinds Jr.<br>Hinds & Shankman LLP<br>21257 Hawthorne Blvd 2nd Floor<br>Torrance, CA 90503 | Leonard M. Ross<br>PO Box 10539<br>Beverly Hills, CA 90213 |
| Employment Development<br>Department Bankruptcy Group<br>MIC 92E<br>P.O. Box 826880<br>Sacramento, CA 94280-0001 | Luan K. Phan<br>1901 Avenue of the Stars, Ste. 277<br>Los Angeles, CA 90067 |
| State Board of Equalization<br>Account Information Group, MIC: 29<br>P.O. Box 942879<br>Sacramento, CA 94279-0029 | Los Angeles County Tax Collector<br>PO Box 54110<br>Los Angeles, CA 90054 |
| Franchise Tax Board<br>Bankruptcy Section MS A340<br>P.O. Box 2952<br>Sacramento, CA 95812 | Spectrum<br>PO Box 60074<br>City of Industry, CA 91716 |
| Advanced Computers and Graphics<br>918 W. Glenoaks Blvd.<br>Glendale, CA 91202 | Michael D. Murphy<br>9401 Wilshire Blvd., 9th Floor<br>Beverly Hills, CA 90212 |

| | |
|---|---|
| Gustavo Francisco Reynoso<br>2237 W. Francisquito Ave<br>West Covina, CA 91790 | Merri Jean Ross<br>9530 Hidden Valley Road<br>Beverly Hills, CA 90210 |
| Arendt & Medenarch SA<br>41A Avenue JF Kennedy L-2082<br>Luxembourg | Martin N. Burton<br>2026 Hilldale Drive<br>La Canada Flintridge, CA 91011 |
| Chimney Hill Properties Ltd<br>1013 North Beverly Drive<br>Beverly Hills, CA 90210 | Summer Saad<br>17010 West Sunset Apt 23<br>Pacific Palisades, CA 90272 |
| City of Beverly Hills<br>P.O. Box 845806<br>Los Angeles, CA 90084 | Robert Meylan<br>444 S. Flower Street, Ste 1850<br>Los Angeles, CA 90071 |
| HAR-BD LLC<br>c/o Armanino LLP<br>11766 Wilshire Blvd, 9th Floor<br>Los Angeles, CA 90025 | Rossco Holdings Inc.<br>P.O. Box 10539<br>Beverly Hills, CA 90213 |
| Steven A. Woods<br>701 Brazoa Street Ste. 1500<br>Austin , TX 78701 | Southern California Edison<br>P.O. Box 300<br>Glendale, CA 91202 |
| Glorya Kaufman<br>c/o Harvey Bookstein<br>11766 Wilshire Blvd, 9th Floor<br>Los Angeles, CA 90025 | Smuggler Inc.<br>823 Seward St. Unit B<br>Los Angeles, CA 90038 |
| Via Messenger | |
| The Hon. Vincent P. Zurzolo<br>United States Bankruptcy Court<br>Central District of California - Chambers Copy<br>255 E. Temple Street, Suite 1360 / Courtroom 1368<br>Los Angeles, CA 90012 | |