1  ROBERT M. YASPAN, SBN 051867
   JOSEPH G. McCARTY, SBN 151020
2  DEBRA R. BRAND, SBN 162285
   LAW OFFICES OF ROBERT M. YASPAN
3  21700 Oxnard Street, Suite 1750
   Woodland Hills, California 91367
4  Telephone: (818) 905-7711
   Facsimile: (818) 501-7711
5
6  *General Counsel for Debtor-in-Possession*

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  IN RE:                                ) Chapter No.: 11
                                          )
12                                        ) Case No.: 2:19-bk-23823-VZ
    TBH19 LLC, a Delaware limited liability )
13  company                               )
                                          ) **MOTION FOR ORDER DISALLOWING**
14              Debtor                    ) **CLAIM NO. 14-1 (HAR, LLC AND HARVEY**
                                          ) **BOOKSTEIN); DECLARATION OF**
15                                        ) **LEONARD ROSS; REQUEST FOR**
                                          ) **PRESERVATION OF LIEN UNDER 11**
16                                        ) **U.S.C. SECTION 551; REQUEST FOR**
                                          ) **IMPOSITION OF ADVERSARY RULES;**
17                                        ) **AND REQUEST OF DEBTOR FOR THE**
                                          ) **HOLDING OF A STATUS CONFERENCE**
18                                        )
19                                        ) [Notice of Filing of Exhibits Relating to Loan
                                          ) Documents filed concurrently herewith]
20                                        )
21                                        )
                                          ) Date:  August 25, 2020
22                                        ) Time:  11:00 a.m.
                                          ) Place: Courtroom 1368
23                                        )        255 E. Temple Street
                                          )        Los Angeles, CA 90012
24                                        )
25                                        )
    _____)
26

27

28

                                          1

# TABLE OF CONTENTS

I.      BACKGROUND.................................................................    2

        A.    Jurisdiction and Venue..................................................    2

        B.    The Debtor's Bankruptcy Filing.......................................    2

        C.    The Debtor's Business and Events Precipitating the
              Filing of the Bankruptcy...............................................    2

        D.    The HAR-LLC and BOOKSTEIN Proof of Claim...................    3

        1.    Factual Background regarding the Loan to TBH.....................    4

        2.    Specific Objections to the HAR POC.................................    14

        A.    The HAR POC is Simply an Alleged Unsecured
              Claim and Not an Alleged Equity Interest in Debtor.................    15

II.     RELIEF REQUESTED........................................................    16

III.    RESERVATION OF RIGHTS..............................................    16

IV.     RESERVATION OF RIGHTS RELATING TO STATE COURT CASES    16


CODES AND STATUTES

28 U.S.C. § 157..............................................................    2

28 U.S.C. §157(b)(2)........................................................    2

28 U.S.C. §1334..............................................................    2

28 U.S.C. §1408..............................................................    2

28 U.S.C. §1409..............................................................    2

Debtor-in-Possession TBH19, LLC, a Delaware limited liability company ("TBH" or "Debtor"), hereby submits this objection (the "Objection") to proof of claim number 14-1 filed by HAR, LLC ("HAR") and HARVEY BOOKSTEIN ("Bookstein", BOOKSTEIN, or "Claimant").

Pursuant to this Objection, the Debtor seeks an order disallowing proof of claim no. 14-1 as an alleged unsecured claim or as an alleged equity interest as more particularly set forth below, pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 3007-1 and 9014-1 of the Local Bankruptcy Rules ("Local Bankruptcy Rules") for the United States Bankruptcy Court for the Central District of California.  In support of this Objection, the Debtor submits the Declaration of Leonard Ross ("Ross Dec.") and Notice of Filing of Exhibits Relating to Loan Documents ("Exhibits Notice") (Docket No. 499).   The Debtor further submits as follows:

## I.

## BACKGROUND

### A.    Jurisdiction and Venue

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

### B.    The Debtor's Bankruptcy Filing

2.    On November 24, 2019 ("Petition Date"), the Debtor commenced its reorganization case by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Ross Dec., Paragraph 2.

### C.    The Debtor's Business and Events Precipitating the Filing of the Bankruptcy

3.    Debtor owns an approximately 40,000 square foot Beverly Hills estate located at

1011 N. Beverly Drive, Beverly Hills, California 90210 (the "Property"). The Beverly House is an historic estate that was owned by William Randolph Hearst and occupied by him and his paramour, Marion Davies, the final years of Mr. Hearst's life. Ross Dec., Paragraph 3.

4.    The Property is approximately 3.53 acres with original landscaping by the late well-known landscape architect, Paul Thiene. The Property features hand-carved woodwork, two projection rooms, double master suites, four guest suites, quarters for four servants (with a total of 17 bedrooms and 29 bathrooms), a commercial kitchen, an art-deco nightclub, waterfalls, ponds, a swimming pool, and a separate guest house with full amenities. The Property has a present value of at least $115,000,000. Ross Dec., Paragraph 4.

5.    Prior to the COVID-19 crisis, the Property was rented by Debtor on a daily, weekly, or monthly basis for use as a temporary residence, as a movie set, and various events. Since the COVID-19 crisis, the rental value has declined. In 2018, the gross rent income for the Property was about $3,000,000. Ross Dec., Paragraph 5.

6.    Debtor is beneficially owned by Leonard M. Ross, Individually and as Trustee of the Leonard M. Ross Revocable Trust (u/d/T 12-20-85) (collectively "Ross" or "ROSS"). Ross has beneficially owned the Property since in or about 1976. Ross Dec., Paragraph 6.

7.    The First Deed of Trust on the Property sued Debtor alleging a default on its loan and sought a receiver for the Property. Debtor filed its present bankruptcy proceeding to stop the foreclosure. Ross Dec., Paragraph 6.

**D.    The HAR-LLC and BOOKSTEIN Proof of Claim**

8.    On April 28, 2020, HAR and BOOKSTEIN filed Proof of Claim No. 14-1, which asserts a unsecured claim of $3,972,571.76 against the Debtor or an alleged equity interest in Debtor (the "HAR POC" or "CLAIM"). A copy of the Proof of Claim is attached to the Declaration of Ross Dec. as Exhibit 1. Ross Dec., Paragraph 7.

9.    The alleged basis for the HAR POC is an alleged agreement to make an

unsecured loan or take a limited equity interest in Debtor. Debtor objects to the HAR POC as further described below.

**1.** **Factual Background regarding the Loan to TBH.**

10.    ROSS owned the PROPERTY from approximately 1976 to 2015. ROSS transferred the PROPERTY to TBH in 2015. Ross Dec., paragraph 8.

11.    Thereafter, TBH refinanced the PROPERTY. The loan that facilitated the refinancing was made by Defendant DBD in the original principal amount of $40,000,000 ("LOAN" or "Loan"). Ross Dec., paragraph 9.

12.    The LOAN was funded and boarded on or about December 23, 2015  Ross Dec., paragraph 10.

13.    The LOAN was documented by agreements with the Debtor and other parties (collectively the "LOAN DOCUMENTS") which include but are not limited to, the following: (1) the Loan and Security Agreement between DBD and TBH dated December 23, 2015 ("Loan and Security Agreement") (See, Notice of Filing of Exhibits Relating to Loan Documents ("Exhibits Notice"), Exhibit A; (2) the Representation and Warranty Agreement between TBH and DBD dated December 23, 2015 ("The Representation and Warranty Agreement") See, Exhibits Notice, Exhibit B; (3) the  Guaranty Agreement between Gloria Kaufman, Individually and in her capacity as Trustee of the Glorya KAUFMAN Trust dated 3-13-92 ("KAUFMAN") and DBD dated December 23, 2015 (the "Guaranty Agreement" or "KAUFMAN GUARANTY") See, Exhibits Notice, Exhibit C; (4) the Reimbursement and Indemnity Agreement Secured by Deed of Trust between KAUFMAN and TBH dated December 23, 2015 (the "KAUFMAN FEE AGREEMENT") See, Exhibits Notice, Exhibit D; (5) the Subordination and Intercreditor Agreement (the "Intercreditor Agreement" or "INTERCREDITOR AGREEMENT") between DBD, HAR-BD, LLC ("HAR-BD"), KAUFMAN, and to section 17 only Leonard M. Ross Individually and as Trustee of the Leonard M. Ross Revocable Trust

1   (U/D/T/ 12-20-85) ("Ross") dated December 23, 2015 See, Exhibits Notice, Exhibit E; (6) the

2   Promissory Note between DBD and TBH dated December 23, 2015 (the "TBH NOTE" or

3   "NOTE") See, Exhibits Notice, Exhibit F; (7) the Deed of Trust, Assignment of Leases and

4   Rents, Security Agreement and Fixture Filing between TBH and DBD ("Deed of Trust")

5   recorded in Los Angeles County as document number – 20151623275 See, Exhibits Notice,

6   Exhibit G; (8) the Assignment of Lease and Rents between TBH and DBD dated December 23,

7   2015 ("Assignment of Leases and Rents") See, Exhibits Notice, Exhibit H and (9) the UCC-1

8   Financing Statement dated December 23, 2015 (the "UCC-1") See, Exhibits Notice, Exhibit I.

9

10  Ross Dec., paragraph 11.

11          14.     Part of the proceeds from the LOAN were used to make payments on an alleged

12  secured loan from HAR-BD,LLC which is an entity owned and controlled by Harvey Bookstein

13  ("BOOKSTEIN") (now the claimed loan secured allegedly by the Third Deed of Trust as

14  described below).   A prior loan from another BOOKSTEIN controlled entity, HAR-1011,

15  LLC,was paid off as well.  Ross Dec., paragraph 12.

16

17          15.     TBH is informed and believes, and thereupon alleges, that: (a) immediately after

18  the LOAN was funded, and on or about December 23, 2015, DBD assigned 100% of the TBH

19  NOTE to the FIG INVESTORS; and (b) DBD did not own all, or any part of, the TBH NOTE,

20  and was not a creditor of TBH, from December 23, 2015 to in or around, at least, August 14,

21  2019 (this time period shall be referred to as the "INTERREGNUM").  Ross Dec., paragraph

22  13.

23

24          16.     TBH is informed and believes, and thereupon alleges, that the Deed of Trust,

25  UCC-1, and Assignment of Leases and Rents were not assigned to the FIG INVESTORS during

26  the INTERREGNUM.  TBH is informed and believes, and thereupon alleges that the FIG

27  INVESTORS were general unsecured creditors, if they were anything at all, of TBH during the

28  INTERREGNUM.  Ross Dec., paragraph 14.

17.    Nobody informed TBH of the alleged assignments of the TBH NOTE during the INTERREGNUM.  Ross Dec., paragraph 15.

18.    TBH continued to pay DBD during the INTERREGNUM; a period of time when it did not owe DBD any money.   TBH lacks knowledge or information sufficient to form a belief as to whether the FIG INVESTORS were ever paid during the INTERREGNUM and therefore alleges that DBD has wrongfully disposed of and/or failed to properly credit the payments.  Ross Dec., paragraph 16.

19.    TBH is informed and believes, and thereupon alleges, that the INTERREGNUM ended on or about August 14, 2019 when the FIG INVESTORS assigned back their alleged interests in the TBH NOTE to DBD.  Ross Dec., paragraph 17.

20.    As of December 23, 2015, there were supposed to be three secured claimants who were then allegedly secured by the PROPERTY.  TBH is informed and believes, and thereupon alleges that DBD was supposed to be the first in priority with a disputed claim of now approximately $52,000,000 (the "First").  TBH is further informed and believes, and thereupon alleges that KAUFMAN was supposed to be a second priority secured claim based on the KAUFMAN FEE AGREEMENT with a now disputed claim (apparently for the same money now claimed by DBD) (the "Second").  TBH is further informed and believes, and thereupon alleges that HAR-BD was supposed to be the third priority secured claim with a now disputed claim of about $19,000,000 (the "Third").  Ross Dec., paragraph 18.

21.    As a necessary part of the LOAN transaction, DBD required that Debtor obtain the Guaranty Agreement from a person or entity that had sufficient liquid capital in an amount more than sufficient to repay the entire loan.  Ross Dec., paragraph 19.

22.    DBD and BOOKSTEIN, who is the owner or manager of HAR-BD (the alleged holder of the third deed of trust), represented to Debtor that the purpose of the KAUFMAN GUARANTY, from TBH's viewpoint, was to serve as an assurance of payment on the DBD

Loan and thereby protect Debtor from losing its PROPERTY to foreclosure since the guarantor would be primarily liable on the LOAN and would therefore would make any payments if Debtor was not able to do so and would pay off the entire LOAN if necessary.  The assurance of payment was a material term of the LOAN and related transactions which Debtor relied on in entering into the LOAN and the related agreement Debtor would not have entered into the LOAN and related agreements and made the monthly payments to KAUFMAN in the amount of more than $100,000 (totaling about $3,000,000) without the promise of payment and foreclosure protection provided by the KAUFMAN GUARANTY.  As a part of his services to the Debtor BOOKSTEIN introduced KAUFMAN to the LOAN transaction.  Ross Dec., paragraph 20.

23..    TBH is further informed and believes, and thereupon alleges that BOOKSTEIN was a fiduciary to both KAUFMAN and ROSS, based on his long friendship and business relationship including as accountant, CPA and financial advisor with both, and his accounting, tax and investment advice services over the years.  Ross Dec., paragraph 21.

24.    Prior to the funding of the LOAN, BOOKSTEIN and KAUFMAN represented to TBH that KAUFMAN approximately $160,000,000 in liquid assets in a Fortress controlled fund, and was ready, willing, and able to enter into the Guaranty Agreement.  TBH reasonably relied on this representation of KAUFMAN's wealth, and willingness to be a compensated guarantor of the transaction.  Ross Dec., paragraph 22.

25.    BOOKSTEIN negotiated the amount of the compensation to be due to KAUFMAN as her agent and representative.  Ross Dec., paragraph 23.

26.    KAUFMAN agreed to be bound as a primary obligor on the LOAN and be responsible for making payments due on the LOAN.   DBD also agreed that KAUFMAN was a primary obligor on the LOAN and agreed to accept her performance – i.e. payment of the obligations due under the LOAN.   Ross Dec., paragraph 24.

27.    In pertinent part, the Guaranty Agreement at page 2, section 1, provides the

following:

"Guaranty.

(a)    Guarantor hereby assumes liability for and hereby guarantees payment and performance to Lender of the Guaranteed Obligations (as hereinafter defined) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally acknowledges, covenants and agrees that it is liable for the Guaranteed Obligations **as a primary obligor**. As used herein, the term "Guaranteed Obligations" or "Obligations" means all present and future indebtedness and monetary obligations of Borrower under the Loan Agreement and the other Loan Documents, including without limitation, all outstanding principal, accrued and unpaid interest (at the Note Rate or the Default Rate, as applicable), late charges and any Make Whole Payment (emphasis added).

. . .

(c) This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a Guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempter revocation by Guarantor and after, if Guarantor is a natural person, Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person (including, without limitation, other guarantors, if any), nor against the collateral for the Loan.

(d)    If all or any part of the Guaranteed Obligations is or shall give rise to a monetary obligation, and such monetary obligation shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by Guarantor, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof. [emphasis added]."

(Exhibits Notice, Exhibit C, pages 135-136)

28.    In pertinent part, the Guaranty Agreement at page 6, section 5, paragraph (d), also provides the following:

"Guarantor shall not have any right of subrogation, contribution, reimbursement or indemnity whatsoever or any right of recourse to or with respect to the assets or property

of Borrower or to any collateral for the Loan. In connection with the foregoing Guarantor expressly waives any and all rights of subrogation to Lender against Borrower, and Guarantor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any right to participate in any collateral for the Loan. In addition to and without in any way limiting the foregoing, Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Guarantor to all indebtedness of Borrower to Lender, and agrees with Lender that Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the collateral from the Loan."

(Exhibits Notice, Exhibit C, page 139).

29.    In pertinent part, the Guaranty Agreement at page 10, section 5, paragraph (u), also provides the following:

"No interest in the Property or Borrower: For so long as this Guaranty remains in effect, Guarantor covenants and agrees that Guarantor will not acquire any interest in the Property or Borrower."

(Exhibits Notice, Exhibit C, page 144)

30.    KAUFMAN owed direct contractual duties to TBH under the KAUFMAN FEE AGREEMENT and as a third-party beneficiary under the Guaranty Agreement as more fully described below.  Ross Dec., paragraph 25.

31.    Commencing on or about January 20, 2016 and through and including September 20, 2018, under the KAUFMAN Fee Agreement, TBH paid KAUFMAN an amount in excess of $100,000 per month.   TBH was never in default with KAUFMAN pursuant to the KAUFMAN FEE AGREEMENT (Exhibits Notice Exhibit D, page 156, paragraph 1.7(a)).  To date KAUFMAN has received a total of more than $3,093,699.87 under the KAUFMAN FEE AGREEMENT. TBH's payments to KAUFMAN were sent to BOOKSTEIN as per KAUFMAN's instruction.   Ross Dec., paragraph 26.

32.    TBH failed to make the July 1, 2019 payment due on the LOAN to DBD, which payment included past-due interest starting on April 1, 2019.  According to DBD correspondence, as of June 28, 2019 the amount of the defaulted payment was $809,660.27.

Ross Dec., paragraph 27.

33.    KAUFMAN breached her duty to TBH by, among other breaches, failing to timely make the payment of $809,660.27 or any later or other payment due under the LOAN. Ross Dec., paragraph 28.

34.    Commencing with the funding of the LOAN, TBH paid quarterly payments to DBD through April 2019 which must be credited to the LOAN.   The LOAN also funded an interest reserve in an amount in excess of $900,000, which also must be credited to TBH.   Ross Dec., paragraph 29.

35.    During the INTERREGNUM payments to KAUFMAN were made in consideration for KAUFMAN's promise to perform under the KAUFMAN GUARANTY and to serve as a safety net, and/or function similar to an insurance policy against all consequences of default of the LOAN, to prevent foreclosure of the PROPERTY and PERSONALTY by DBD and to prevent any and all charges fees, penalties, acceleration amounts, increased interest and default interest (collectively "Fortress Penalties and Charges"). TBH agreed to pay this fee for the added protection and safety net that KAUFMAN was supposed to provide.  Ross Dec., paragraph 30.

36.    Under the express terms of the KAUFMAN FEE AGREEMENT and the KAUFMAN GUARANTY, the implied covenant of good faith and fair dealing therein, as well as under the terms,  spirit, and purpose of these agreements, KAUFMAN was required to perform her duties under the Guaranty Agreement prior to DBD taking any action to accelerate the LOAN, increase the interest rate, or initiate foreclosure proceedings against the PROPERTY, or do anything else that would increase the cost and risk (to TBH) of the consequences of default on the LOAN as such would deprive Debtor from having the ability to meet its obligations under the LOAN, the KAUFMAN FEE AGREEMENT, the Guaranty Agreement, and the other related agreements and prevent Debtor from receiving the benefit of

its bargain. Ross Dec., paragraph 31.

37.     Instead of performing her contractual obligations, KAUFMAN waited for DBD to declare a default, assert the default rate of interest, accelerate the note, and assert an added penalty of 5% of the entire loan balance, thereby causing DBD to claim in a matter of weeks that an outstanding loan balance of approximately $47.5 million had increased to $55 million. KAUFMAN did so all while attempting to purchase the DBD NOTE (the LOAN) so that she could then turn and collect an even higher amount from TBH, or pursue her ulterior motive, i.e., to foreclose against TBH, thereby obtaining the very PROPERTY she had already been paid over $3,000,000 to protect from foreclosure. Ross Dec., paragraph 32.

38.     The KAUFMAN Second is based upon the paid KAUFMAN GUARANTY of the payment due on the First for which KAUFMAN was periodically compensated through payments by TBH to BOOKSTEIN, for the benefit of KAUFMAN, as agreed. KAUFMAN has now filed a proof of claim ("KAUFMAN POC") in the sum of $55,391,781.62 as a secured claim (the alleged Second) even though she has never paid one dime on the KAUFMAN Guaranty towards the LOAN. Ross Dec., paragraph 33.

39.     Debtor expected KAUFMAN to pay off the LOAN as specified in the KAUFMAN GUARANTY. However, KAUFMAN instead exercised an alleged right to purchase the LOAN pursuant to the Intercreditor Agreement. In doing so, KAUFMAN tendered payment on the LOAN to DBD which was accepted. However, TBH is informed and believes and thereupon alleges, that before the transaction closed, DBD allegedly failed to provide adequate proof of ownership of the DBD NOTE and the transaction failed to consummate either on a timely basis, or ever. Ross Dec., paragraph 34.

40.     KAUFMAN was required under the KAUFMAN GUARANTY to pay any monetary default so that the default under the LOAN would be cured. Given DBD's alleged acceleration of the LOAN the full amount under the LOAN was allegedly due. Ross Dec.,

paragraph 35.

41.    KAUFMAN tendered payment of the defaulted amount to DBD.  TBH is

informed and believes that KAUFMAN was ready, willing and able to perform.  Ross Dec.,

paragraph 36.

42.    By its terms the KAUFMAN GUARANTY granted KAUFMAN a right of

indemnity as against TBH; it did not grant KAUFMAN the right to obtain the LOAN or an

interest in the PROPERTY.  In fact, KAUFMAN is prohibited from doing so under the

KAUFMAN GUARANTY.  Thus, when KAUFMAN demanded a transfer of the NOTE and

associated security to herself, she was demanding something that she was not entitled to under

the KAUFMAN GUARANTY and which breached said agreement.   Ross Dec., paragraph 37.

43.    KAUFMAN contends that DBD failed to provide good title to the Note and

associated security and therefore she did not have to buy the Note.  KAUFMAN's attorney,

Luan Phan so contended in a letter to DBD attached to the Ross Dec. as Exhibit 3.  Said alleged

failure of DBD, whether or not true, could not and did not obviate KAUFMAN's duty, however,

to perform under the Guaranty Agreement.  Ross Dec., paragraph 38.

44.    DBD sued Debtor alleging a default on the First and sought a receiver for the

PROPERTY.  Debtor then filed its present bankruptcy proceeding to stop the foreclosure.  Ross

Dec., paragraph 39.

45.    DBD insisted upon and required the KAUFMAN GUARANTY as a condition

and requirement of making the LOAN to Debtor.  DBD's requirement of and acceptance of

KAUFMAN as a primary obligor under the LOAN and KAUFMAN's offer of the amount due

under the LOAN was a tender of performance of the LOAN obligations which extinguished

Debtor's obligation under the LOAN as a matter of law.  The fact that KAUFMAN and DBD

subsequently accused each other of breaching the INTERCREDITOR AGREEMENT and sued

each other does not and could not alter the basic fact that Debtor's obligations under the LOAN

have been extinguished under the law.  Ross Dec., paragraph 40.

46.    TBH entered into the LOAN DOCUMENTS with DBD and paid KAUFMAN an amount in excess of $3,093,699.87 under the KAUFMAN FEE AGREEMENT under the false promise that KAUFMAN would serve as a "safety net" against foreclosure.  TBH also gave KAUFMAN a second trust deed against the PROPERTY which she intended to, and did, use for the undisclosed purpose of enabling her to take the PROPERTY from TBH.  Ross Dec., paragraph 41.

47.    Under the "safety net" the Debtor was saved from the effects of default under the KAUFMAN GUARANTY, as KAUFMAN was required to pay all of the LOAN obligations as they came due if at any time Debtor did not.  Ross Dec., paragraph 42.

48.    Although KAUFMAN would then have a claim for indemnity against TBH for all payments KAUFMAN made to DBD, under the terms of the KAUFMAN GUARANTY she was not allowed to pursue TBH until after she paid. The claim for indemnity when it ripened would allegedly be secured by the Second.   However, the claim for indemnity has not yet ripened and as of the TBH petition date nothing was due and owing to KAUFMAN on the Second.  Ross Dec., paragraph 43.

49.    In violation of the above-described purposes and intent of the KAUFMAN FEE AGREEMENT and the KAUFMAN GUARANTY, KAUFMAN failed to timely make payment to DBD after TBH failed to make the payment due. This resulted in an alleged increase of the total balance outstanding on the Loan from alleged default interest and attorney's fees.   Ross Dec., paragraph 44.

50.    TBH, the party KAUFMAN was obligated to protect, and from whom she had received more than $3,093,699.87 in monetary fee payments, from December 2015 to date, is entitled to protection from default and from an increase in the Loan amount.  Ross Dec., paragraph 45.

51.    KAUFMAN's actions confirm that despite entering into the KAUFMAN GUARANTY and receiving more than $3,093,699.87 in payment thereunder, she never intended to honor her promises thereunder and actually guaranty the LOAN payments. Instead, she intended to purchase the LOAN from DBD, and DBD intended to sell the LOAN, so that she could foreclose on the PROPERTY – the very thing she was paid more than $3,093,699.87 to prevent. DBD's, and KAUFMAN's intentions and subsequent action constituted promissory fraud and rendered the alleged KAUFMAN GUARANTY and KAUFMAN FEE AGREEMENT illusory. Ross Dec., paragraph 46.

52.    Under the KAUFMAN FEE AGREEMENT and KAUFMAN GUARANTY, TBH would have been safe from any possible foreclosure until, at least, July 6, 2020, and also would have only been facing possible indemnity obligations to KAUFMAN in a much lesser amount. Ross Dec., paragraph 47.

53.    However, KAUFMAN's breaches described herein have deprived TBH of this certainty and have jeopardized the PROPERTY and put at risk over $52,000,000 to $93,000,000 in equity therein, in addition to causing the current damages of approximately $5,000,000 in increased costs of the LOAN, as described herein. Ross Dec., paragraph 48.

54.    KAUFMAN breached her contract with TBH thereby causing damage to Debtor. Ross Dec., paragraph 49.

55.    KAUFMAN made the false promise to TBH of serving as a safety net/insurance policy against default of the LOAN in order to induce TBH to give KAUFMAN a second trust deed against the Property. Ross Dec., paragraph 50.

2.    **Specific Objections to the HAR POC**

56.    The HAR POC [Proof of Claim No. 14] in the sum of $3,972,571.76 is listed as an alleged unsecured claim or limited equity interest. According to HAR and BOOKSTEIN, the claim is comprised of: (i) alleged advances in the total amount of $3,641,669.61 (the "HAR

LOAN"); and (ii) alleged interest in the amount of $330,902.15 at the interest rate of 10. The HAR LOAN is unsecured but alleges to have an unperfected right to a priority payment on the sale of Debtor's PROPERTY (1011 N. Beverly Drive, Beverly Hills, CA 90210). (HAR POC, page 4 of 12).

57.    HAR merely has an unperfected right to an alleged priority in payment from a sale of the PROPERTY.   Claimants has no right to control Debtor, no requirement of further contribution to Debtor, and no right to share in Debtor's income. Ross Dec., paragraph 51.

**A.    The HAR POC is Simply an Alleged Unsecured Claim and Not an Alleged Equity Interest in Debtor.**

58.    As BOOKSTEIN and HAR admit, they merely have an unperfected right to an alleged priority in payment from a sale of the PROPERTY. They have no right to control Debtor, no requirement of further contribution to Debtor, and no right to share in Debtor's income. Ross Dec., paragraph 52.

59.    Further, any alleged right to a priority distribution from the sale proceeds is simply an unperfected and defective attempt to create a secured claim and must be disallowed on that basis. HAR did not record a deed of trust which is the only way secure a real property claim. There was also no financing statement recorded under the UCC. Ross Dec., paragraph 53.

**II.**
**RELIEF REQUESTED**

66.    The Debtor requests that the HAR POC to the extent it is allowed should be allowed only as an unsecured claim. Any contention that HAR or BOOKSTEIN have an equity interest or right to an alleged priority distribution from a sale of the Property should be disallowed as an unperfected and defective claim as set forth above.

## III.
## RESERVATION OF RIGHTS

60.     Nothing contained in this Objection shall be deemed an admission by TBH of liability for claims against its estate, and it does not waive any rights against any party.  TBH expressly reserves all rights, including without limitation the right to: (i) amend, modify, or supplement this Objection, (ii) respond to any reply filed by Claimant with respect hereto, (iii) file further objections to or otherwise oppose any claims asserted by Claimant in this case, and (iv) seek affirmative or other relief with respect to any claimants.

61.     The Debtor requests that the Court authorize the use of the adversary rules for discovery purposes.

## IV.
## RESERVATION OF RIGHTS RELATING TO STATE COURT CASES

62.     On or about September 3, 2019, DBD filed a complaint alleging breach of the guaranty against KAUFMAN in the Los Angeles Superior Court, styled as *DBD v. Kaufman et al.,* Case No. 19STCV31137. On October 15, 2019, KAUFMAN filed her cross-complaint asserting causes of action against DBD for breach of the Intercreditor Agreement and breach of implied covenant of good faith and fair dealing, and causes of action against the Debtor and Ross for indemnity and contribution, unjust enrichment, and set off. ("DBD Litigation").  Ross Dec., paragraph 54.

63.     On or about September 16, 2019, the Debtor and Ross filed a related action, styled as *TBH19 LLC v. Bookstein* designated as Case No. 19STCV32941, alleging numerous tort- and contract-based causes of action against DBD, KAUFMAN, HAR-BD, HAR-RFF, HAR-LLC and BOOKSTEIN, among others. ("TBH Litigation").  The DBD Litigation and the TBH Litigation are collectively referred to as the "State Court Litigation".  Ross Dec., paragraph 55.

64.     The cases were removed to this Court on February 20, 2020.  The Court

remanded the actions on May 28, 2020 and entered an Order dated June 9, 2020. The remand was to liquidate the claims. The Court stated that the portions of the objections to Proofs of Claim relating to the liquidation would be stayed pending the resolution or judgment of the State Court Litigation but not any allowability issues. Ross Dec., paragraph 56.

65.    As such, Debtor reserves its rights to amend this proof of claim objection to include any judgment, discovery, testimony and/or other evidence that arises out of the State Court Litigation or any other proceeding.

# V.
## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (a) sustain the objections stated herein; (b) authorize discovery under the adversary rules; and (c) grant such other and further relief as is just and appropriate under the circumstances

Dated: July 24, 2020                LAW OFFICES OF ROBERT M. YASPAN

By _____
ROBERT M. YASPAN
Attorneys for Debtor-in-Possession

## DECLARATION OF LEONARD ROSS

I, Leonard Ross, hereby declare as follows:

1.      I am the manager of LMR-TBH, LLC ("LMR") which is the Manager of Debtor and Debtor-in-Possession TBH19 LLC ("TBH19") or ("Debtor") in the above-captioned bankruptcy. I have personal knowledge of the facts set forth herein and if called as a witness I could, and would, so competently testify hereto.

2.      On November 24, 2019 (the "Petition Date"), the Debtor commenced its reorganization by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is continuing in possession of its assets and is operating and managing its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      Debtor owns an approximately 40,000 square foot Beverly Hills estate located at 1011 N. Beverly Drive, Beverly Hills, California 90210 (the "Property" or "PROPERTY").  The Beverly House is an historic estate that was owned by William Randolph Hearst and occupied by him and his paramour, Marion Davies, the final years of Mr. Hearst's life.

4.      The Property is approximately 3.53 acres with original landscaping by the late well-known landscape architect, Paul Thiene.  The Property features hand-carved woodwork, two projection rooms, double master suites, four guest suites, quarters for four servants (with a total of 17 bedrooms and 29 bathrooms), a commercial kitchen, an art-deco nightclub, waterfalls, ponds, a swimming pool, and a separate guest house with full amenities.  The Property has a present value of at least $115,000,000.

5.      Prior to the COVID-19 crisis, the Property was rented by Debtor on a daily, weekly, or monthly basis for use as a temporary residence, as a movie set, and various events. Since the COVID-19 crisis, the rental value has declined.  In 2018, the gross rent income for the Property was about $3,000,000.

6.      Debtor is beneficially owned by Leonard M. Ross, Individually and as Trustee of the Leonard M. Ross Revocable Trust (u/d/T 12-20-85) (collectively "Ross" or "ROSS").  Ross has beneficially owned the Property since in or about 1976.   The First Deed of Trust on the Property sued Debtor alleging a default on its loan and sought a receiver for the Property. Debtor filed its present bankruptcy proceeding to stop the foreclosure.  Ross Dec., Paragraph 6.

7.      On April 28, 2020, HAR and BOOKSTEIN filed Proof of Claim No. 14, which asserts a unsecured claim of $3,972,571.76  against the Debtor or an alleged equity interest in Debtor (the "HAR POC" or "CLAIM").  A copy of the Proof of Claim is attached hereto as Exhibit 1.

8.      ROSS owned the PROPERTY from approximately 1976 to 2015.  ROSS transferred the PROPERTY to TBH in 2015.

9.      Thereafter, TBH refinanced the PROPERTY.  The loan that facilitated the refinancing was made by Defendant DBD in the original principal amount of $40,000,000 ("LOAN" or "Loan").

10.      The LOAN was funded and boarded on or about December 23, 2015.

11.      The LOAN was documented by agreements with the Debtor and other parties (collectively the "LOAN DOCUMENTS") which include but are not limited to, the following: (1) the Loan and Security Agreement between DBD and TBH dated December 23, 2015 ("Loan and Security Agreement") (See, Notice of Filing of Exhibits Relating to Loan Documents ("Exhibits Notice"), Exhibit A; (2) the Representation and Warranty Agreement between TBH and DBD dated December 23, 2015 ("The Representation and Warranty Agreement") See, Exhibits Notice, Exhibit B; (3) the  Guaranty Agreement between Gloria Kaufman, Individually and in her capacity as Trustee of the Glorya KAUFMAN Trust dated 3-13-92 ("KAUFMAN") and DBD dated December 23, 2015 (the "Guaranty Agreement" or "KAUFMAN GUARANTY") See, Exhibits Notice, Exhibit C; (4) the Reimbursement and Indemnity

Agreement Secured by Deed of Trust between KAUFMAN and TBH dated December 23, 2015 (the "KAUFMAN FEE AGREEMENT") See, Exhibits Notice, Exhibit D; (5) the Subordination and Intercreditor Agreement (the "Intercreditor Agreement" or "INTERCREDITOR AGREEMENT") between DBD, HAR-BD, LLC ("HAR-BD"), KAUFMAN, and to section 17 only Leonard M. Ross Individually and as Trustee of the Leonard M. Ross Revocable Trust (U/D/T/ 12-20-85) ("Ross") dated December 23, 2015 See, Exhibits Notice, Exhibit E; (6) the Promissory Note between DBD and TBH dated December 23, 2015 (the "TBH NOTE" or "NOTE") See, Exhibits Notice, Exhibit F; (7) the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing between TBH and DBD ("Deed of Trust") recorded in Los Angeles County as document number – 20151623275 See, Exhibits Notice, Exhibit G; (8) the Assignment of Lease and Rents between TBH and DBD dated December 23, 2015 ("Assignment of Leases and Rents") See, Exhibits Notice, Exhibit H and (9) the UCC-1 Financing Statement dated December 23, 2015 (the "UCC-1") See, Exhibits Notice, Exhibit I.

12.    Part of the proceeds from the LOAN were used to make payments on an alleged secured loan from HAR-BD,LLC which is an entity owned and controlled by Harvey Bookstein ("BOOKSTEIN") (now the claimed loan secured allegedly by the Third Deed of Trust as described below).   A prior loan from another BOOKSTEIN controlled entity, HAR-1011, LLC, was paid off as well.

13.    TBH is informed and believes, and thereupon alleges, that: (a) immediately after the LOAN was funded, and on or about December 23, 2015, DBD assigned 100% of the TBH NOTE to the FIG INVESTORS; and (b) DBD did not own all, or any part of, the TBH NOTE, and was not a creditor of TBH, from December 23, 2015 to in or around, at least, August 14, 2019 (this time period shall be referred to as the "INTERREGNUM").

14.    TBH is informed and believes, and thereupon alleges, that the Deed of Trust, UCC-1, and Assignment of Leases and Rents were not assigned to the FIG INVESTORS during

the INTERREGNUM.  TBH is informed and believes, and thereupon alleges that the FIG

INVESTORS were general unsecured creditors, if they were anything at all, of TBH during the

INTERREGNUM.

     15.    Nobody informed TBH of the alleged assignments of the TBH NOTE during the

INTERREGNUM.

     16.    TBH continued to pay DBD during the INTERREGNUM; a period of time when

it did not owe DBD any money.   TBH lacks knowledge or information sufficient to form a

belief as to whether the FIG INVESTORS were ever paid during the INTERREGNUM and

therefore alleges that DBD has wrongfully disposed of and/or failed to properly credit the

payments.

     17.    TBH is informed and believes, and thereupon alleges, that the INTERREGNUM

ended on or about August 14, 2019 when the FIG INVESTORS assigned back their alleged

interests in the TBH NOTE to DBD.

     18.    As of December 23, 2015, there were supposed to be three secured claimants

who were then allegedly secured by the PROPERTY.  TBH is informed and believes, and

thereupon alleges that DBD was supposed to be the first in priority with a disputed claim of now

approximately $52,000,000 (the "First").  TBH is further informed and believes, and thereupon

alleges that KAUFMAN was supposed to be a second priority secured claim based on the

KAUFMAN FEE AGREEMENT with a now disputed claim (apparently for the same money

now claimed by DBD) (the "Second").  TBH is further informed and believes, and thereupon

alleges that HAR-BD was supposed to be the third priority secured claim with a now disputed

claim of about $19,000,000 (the "Third").

     19.    As a necessary part of the LOAN transaction, DBD required that Debtor obtain

the Guaranty Agreement from a person or entity that had sufficient liquid capital in an amount

more than sufficient to repay the entire loan.

20.    DBD and BOOKSTEIN, who is the owner or manager of HAR-BD (the alleged holder of the third deed of trust), represented to Debtor that the purpose of the KAUFMAN GUARANTY, from TBH's viewpoint, was to serve as an assurance of payment on the DBD Loan and thereby protect Debtor from losing its PROPERTY to foreclosure since the guarantor would be primarily liable on the LOAN and would therefore would make any payments if Debtor was not able to do so and would pay off the entire LOAN if necessary.  The assurance of payment was a material term of the LOAN and related transactions which Debtor relied on in entering into the LOAN and the related agreement Debtor would not have entered into the LOAN and related agreements and made the monthly payments to KAUFMAN in the amount of more than $100,000 (totaling about $3,000,000) without the promise of payment and foreclosure protection provided by the KAUFMAN GUARANTY.  As a part of his services to the Debtor BOOKSTEIN introduced KAUFMAN to the LOAN transaction.

21.    TBH is further informed and believes, and thereupon alleges that BOOKSTEIN was a fiduciary to both KAUFMAN and ROSS, based on his long friendship and business relationship including as accountant, CPA and financial advisor with both, and his accounting, tax and investment advice services over the years.

22.    Prior to the funding of the LOAN, BOOKSTEIN and KAUFMAN represented to TBH that KAUFMAN approximately $160,000,000 in liquid assets in a Fortress controlled fund, and was ready, willing, and able to enter into the Guaranty Agreement.  TBH reasonably relied on this representation of KAUFMAN's wealth, and willingness to be a compensated guarantor of the transaction.

23.    BOOKSTEIN negotiated the amount of the compensation to be due to KAUFMAN as her agent and representative.

24.    KAUFMAN agreed to be bound as a primary obligor on the LOAN and be responsible for making payments due on the LOAN.  DBD also agreed that KAUFMAN was a

primary obligor on the LOAN and agreed to accept her performance – i.e. payment of the obligations due under the LOAN.

25.     KAUFMAN owed direct contractual duties to TBH under the KAUFMAN FEE AGREEMENT and as a third-party beneficiary under the Guaranty Agreement as more fully described below.

26.     Commencing on or about January 20, 2016 and through and including September 20, 2018, under the KAUFMAN Fee Agreement, TBH paid KAUFMAN an amount in excess of $100,000 per month.   TBH was never in default with KAUFMAN pursuant to the KAUFMAN FEE AGREEMENT (Exhibits Notice Exhibit D, page 156, paragraph 1.7(a)).  To date KAUFMAN has received a total of more than $3,093,699.87 under the KAUFMAN FEE AGREEMENT. TBH's payments to KAUFMAN were sent to BOOKSTEIN as per KAUFMAN's instruction.

27.     TBH failed to make the July 1, 2019 payment due on the LOAN to DBD, which payment included past-due interest starting on April 1, 2019.  According to DBD correspondence, as of June 28, 2019 the amount of the defaulted payment was $809,660.27.

28.     KAUFMAN breached her duty to TBH by, among other breaches, failing to timely make the payment of $809,660.27 or any later or other payment due under the LOAN.

29.     Commencing with the funding of the LOAN, TBH paid quarterly payments to DBD through April 2019 which must be credited to the LOAN.   The LOAN also funded an interest reserve in an amount in excess of $900,000, which also must be credited to TBH.

30.     During the INTERREGNUM payments to KAUFMAN were made in consideration for KAUFMAN's promise to perform under the KAUFMAN GUARANTY and to serve as a safety net, and/or function similar to an insurance policy against all consequences of default of the LOAN, to prevent foreclosure of the PROPERTY and PERSONALTY by DBD and to prevent any and all charges fees, penalties, acceleration amounts, increased interest and

1  default interest (collectively "Fortress Penalties and Charges"). TBH agreed to pay this fee for

2  the added protection and safety net that KAUFMAN was supposed to provide.

3       31.    Under the express terms of the KAUFMAN FEE AGREEMENT and the

4  KAUFMAN GUARANTY, the implied covenant of good faith and fair dealing therein, as well

5  as under the terms, spirit, and purpose of these agreements, KAUFMAN was required to

6  perform her duties under the Guaranty Agreement prior to DBD taking any action to accelerate

7  the LOAN, increase the interest rate, or initiate foreclosure proceedings against the

8  PROPERTY, or do anything else that would increase the cost and risk (to TBH) of the

9  consequences of default on the LOAN as such would deprive Debtor from having the ability to

10 meet its obligations under the LOAN, the KAUFMAN FEE AGREEMENT, the Guaranty

11 Agreement, and the other related agreements and prevent Debtor from receiving the benefit of

12 its bargain.

13      32.    Instead of performing her contractual obligations, KAUFMAN waited for DBD

14 to declare a default, assert the default rate of interest, accelerate the note, and assert an added

15 penalty of 5% of the entire loan balance, thereby causing DBD to claim in a matter of weeks

16 that an outstanding loan balance of approximately $47.5 million had increased to $55 million.

17 KAUFMAN did so all while attempting to purchase the DBD NOTE (the LOAN) so that she

18 could then turn and collect an even higher amount from TBH, or pursue her ulterior motive, i.e.,

19 to foreclose against TBH, thereby obtaining the very PROPERTY she had already been paid

20 over $3,000,000 to protect from foreclosure.

21      33.    The KAUFMAN Second is based upon the paid KAUFMAN GUARANTY of

22 the payment due on the First for which KAUFMAN was periodically compensated through

23 payments by TBH to BOOKSTEIN, for the benefit of KAUFMAN, as agreed. KAUFMAN has

24 now filed a proof of claim ("KAUFMAN POC") in the sum of $55,391,781.62 as a secured

25 claim (the alleged Second) even though she has never paid one dime on the KAUFMAN

Guaranty towards the LOAN.

34.    Debtor expected KAUFMAN to pay off the LOAN as specified in the KAUFMAN GUARANTY. However, KAUFMAN instead exercised an alleged right to purchase the LOAN pursuant to the Intercreditor Agreement. In doing so, KAUFMAN tendered payment on the LOAN to DBD which was accepted. However, TBH is informed and believes and thereupon alleges, that before the transaction closed, DBD allegedly failed to provide adequate proof of ownership of the DBD NOTE and the transaction failed to consummate either on a timely basis, or ever.

35.    KAUFMAN was required under the KAUFMAN GUARANTY to pay any monetary default so that the default under the LOAN would be cured. Given DBD's alleged acceleration of the LOAN the full amount under the LOAN was allegedly due.

36.    KAUFMAN tendered payment of the defaulted amount to DBD. TBH is informed and believes that KAUFMAN was ready, willing and able to perform.

37.    By its terms the KAUFMAN GUARANTY granted KAUFMAN a right of indemnity as against TBH; it did not grant KAUFMAN the right to obtain the LOAN or an interest in the PROPERTY. In fact, KAUFMAN is prohibited from doing so under the KAUFMAN GUARANTY. Thus, when KAUFMAN demanded a transfer of the NOTE and associated security to herself, she was demanding something that she was not entitled to under the KAUFMAN GUARANTY and which breached said agreement.

38.    KAUFMAN contends that DBD failed to provide good title to the Note and associated security and therefore she did not have to buy the Note. KAUFMAN's attorney, Luan Phan so contended in a letter to DBD attached to the Ross Dec. as Exhibit 3. Said alleged failure of DBD, whether or not true, could not and did not obviate KAUFMAN's duty, however, to perform under the Guaranty Agreement.

39.    DBD sued Debtor alleging a default on the First and sought a receiver for the

PROPERTY.  Debtor then filed its present bankruptcy proceeding to stop the foreclosure.

40.    DBD insisted upon and required the KAUFMAN GUARANTY as a condition and requirement of making the LOAN to Debtor.  DBD's requirement of and acceptance of KAUFMAN as a primary obligor under the LOAN and KAUFMAN's offer of the amount due under the LOAN was a tender of performance of the LOAN obligations which extinguished Debtor's obligation under the LOAN as a matter of law.  The fact that KAUFMAN and DBD subsequently accused each other of breaching the INTERCREDITOR AGREEMENT and sued each other does not and could not alter the basic fact that Debtor's obligations under the LOAN have been extinguished under the law.

41.    TBH entered into the LOAN DOCUMENTS with DBD and paid KAUFMAN an amount in excess of $3,093,699.87 under the KAUFMAN FEE AGREEMENT under the false promise that KAUFMAN would serve as a "safety net" against foreclosure.  TBH also gave KAUFMAN a second trust deed against the PROPERTY which she intended to, and did, use for the undisclosed purpose of enabling her to take the PROPERTY from TBH.

42.    Under the "safety net" the Debtor was saved from the effects of default under the KAUFMAN GUARANTY, as KAUFMAN was required to pay all of the LOAN obligations as they came due if at any time Debtor did not.

43.    Although KAUFMAN would then have a claim for indemnity against TBH for all payments KAUFMAN made to DBD, under the terms of the KAUFMAN GUARANTY she was not allowed to pursue TBH until after she paid. The claim for indemnity when it ripened would allegedly be secured by the Second.  However, the claim for indemnity has not yet ripened and as of the TBH petition date nothing was due and owing to KAUFMAN on the Second.

44.    In violation of the above-described purposes and intent of the KAUFMAN FEE AGREEMENT and the KAUFMAN GUARANTY, KAUFMAN failed to timely make payment

1  to DBD after TBH failed to make the payment due. This resulted in an alleged increase of the

2  total balance outstanding on the Loan from alleged default interest and attorney's fees.

3    45. TBH, the party KAUFMAN was obligated to protect, and from whom she had

4  received more than $3,093,699.87 in monetary fee payments, from December 2015 to date, is

5  entitled to protection from default and from an increase in the Loan amount.

6
7    46. KAUFMAN's actions confirm that despite entering into the KAUFMAN

8  GUARANTY and receiving more than $3,093,699.87 in payment thereunder, she never

9  intended to honor her promises thereunder and actually guaranty the LOAN payments. Instead,

10  she intended to purchase the LOAN from DBD, and DBD intended to sell the LOAN, so that

11  she could foreclose on the PROPERTY – the very thing she was paid more than $3,093,699.87

12  to prevent. DBD's, and KAUFMAN's intentions and subsequent action constituted promissory

13  fraud and rendered the alleged KAUFMAN GUARANTY and KAUFMAN FEE

14  AGREEMENT illusory.

15
16    47. Under the KAUFMAN FEE AGREEMENT and KAUFMAN GUARANTY,

17  TBH would have been safe from any possible foreclosure until, at least, July 6, 2020, and also

18  would have only been facing possible indemnity obligations to KAUFMAN in a much lesser

19  amount.

20    48. However, KAUFMAN's breaches described herein have deprived TBH of this

21  certainty and have jeopardized the PROPERTY and put at risk over $52,000,000 to $93,000,000

22  in equity therein, in addition to causing the current damages of approximately $5,000,000 in

23  increased costs of the LOAN, as described herein.

24
25    49. KAUFMAN breached her contract with TBH thereby causing damage to Debtor.

26    50. KAUFMAN made the false promise to TBH of serving as a safety net/insurance

27  policy against default of the LOAN in order to induce TBH to give KAUFMAN a second trust

28  deed against the Property.

51.    HAR merely has an unperfected right to an alleged priority in payment from a sale of the PROPERTY.  Claimants have no right to control Debtor, no requirement of further contribution to Debtor, and no right to share in Debtor's income.

52.    As BOOKSTEIN and HAR admit, they merely have an unperfected right to an alleged priority in payment from a sale of the PROPERTY.  They have no right to control Debtor, no requirement of further contribution to Debtor, and no right to share in Debtor's income.

53.    Further, any alleged right to a priority distribution from the sale proceeds is simply an unperfected and defective attempt to create a secured claim and must be disallowed on that basis.  HAR did not record a deed of trust which is the only way secure a real property claim.  There was also no financing statement recorded under the UCC.

54.    On or about September 3, 2019, DBD filed a complaint alleging breach of the guaranty against KAUFMAN in the Los Angeles Superior Court, styled as *DBD v. Kaufman et al.,* Case No. 19STCV31137. On October 15, 2019, KAUFMAN filed her cross-complaint asserting causes of action against DBD for breach of the Intercreditor Agreement and breach of implied covenant of good faith and fair dealing, and causes of action against the Debtor and Ross for indemnity and contribution, unjust enrichment, and set off. ("DBD Litigation").

55.    On or about September 16, 2019, the Debtor and Ross filed a related action, styled as *TBH19 LLC v. Bookstein* designated as Case No. 19STCV32941, alleging numerous tort- and contract-based causes of action against DBD, KAUFMAN, HAR-BD, HAR-RFF, HAR-LLC and BOOKSTEIN, among others. ("TBH Litigation").  The DBD Litigation and the TBH Litigation are collectively referred to as the "State Court Litigation".

56.    The cases were removed to this Court on February 20, 2020.  The Court remanded the actions on May 28, 2020 and entered an Order dated June 9, 2020.  The remand was to liquidate the claims.  The Court stated that the portions of the objections to Proofs of

Claim relating to the liquidation would be stayed pending the resolution or judgment of the State Court Litigation but not any allowability issues.

57.    TBH contends that Proof of Claim No. 14-1 should be disallowed as set forth herein.

Executed at Beverly Hills, California this 24th day of July 2020.

I declare under penalty of perjury that the preceding is true and correct under the laws of the United States of America and the State of California.

Leonard Ross, Declarant

29

# EXHIBIT 1

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | THB19, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 2:19-bk-23823-VZ |

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. | Who is the current creditor? | HAR, LLC and Harvey Bookstein<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. | Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Harvey Bookstein<br>Name<br>11766 Wilshire Boulevard, Ninth Floor<br>Number    Street<br>Los Angeles          CA          90025<br>City          State          ZIP Code<br><br>Contact phone (310) 745-5722<br>Contact email harvey.bookstein@armaninoLLP.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | **Where should payments to the creditor be sent? (if different)**<br><br>Name<br>Number    Street<br>City          State          ZIP Code<br><br>Contact phone _____<br>Contact email _____ |
| 4. | Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____          Filed on ____ / ____ / _____<br>                                                                                                                    MM  / DD  / YYYY |
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $_____3,972,571.76_____. **Does this amount include interest or other charges?**

(plus other amounts    ☐ No
as set forth in the attachment)    ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money loaned

**9. Is all or part of the claim secured?**

☑ No
☐ Yes.    The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check all that apply:*<br><br>☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).<br><br>☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).<br><br>☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).<br><br>☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).<br><br>☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).<br><br>☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.<br><br>* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | Amount entitled to priority<br><br>$_____<br><br>$_____<br><br>$_____<br><br>$_____<br><br>$_____<br><br>$_____ |

### Part 3:  Sign Below

| | |
|---|---|
| **The person completing this proof of claim must sign and date it.** FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date   04/28/2020<br>　　　　　　　　　　MM / DD / YYYY<br><br><br>_____<br>Signature<br><br>**Print the name of the person who is completing and signing this claim:** |

| | |
|---|---|
| Name | **Harvey Bookstein** |
| | First name            Middle name            Last name |
| Title | **Manager** |
| Company | **HAR, LLC** |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | **11766 Wilshire Boulevard, Ninth Floor** |
| | Number      Street |
| | **Los Angeles**                    **CA**      **90025** |
| | City                    State      ZIP Code |
| Contact phone | **(310) 745-5722** | Email **harvey.bookstein@armaninoLLP.com** |

## ATTACHMENT TO PROOF OF CLAIM

Claimant Harvey Bookstein is the Manager of Claimant HAR, LLC. This Proof of Claim is filed jointly on behalf of both Claimants, who will allocate between themselves any distribution received from the Debtor on account of the claims asserted in this proof of claim.

HAR, LLC, the Debtor, Leonard Ross, and LMR-TBH, LLC, are parties to the Agreement and Addendum to Second Amended and Second Restated Limited Liability Company Agreement of TBH19, LLC entered into as of November 21, 2018 (the "Agreement"). A copy of the Agreement is attached as Exhibit A.

Prior to the Agreement, Harvey Bookstein advanced funds to or on behalf of the Debtor in the amount of $1,888,199. Pursuant to the Agreement, HAR, LLC contributed an additional $1,753,470.61 to the Debtor for payment of certain obligations due to DBD Credit Funding LLC ("DBD"). While the contributions are characterized as capital contributions in Paragraphs 1 and 3 of the Agreement, Paragraph 7.d. of the Agreement provides that upon the close of escrow for the sale of the Debtor's real property located at 1011 N. Beverly Drive, Beverly Hills, CA 90210, after payment in full of all amounts owed to DBD, HAR-BD, LLC, and Glorya Kaufman, Claimants shall receive payment in full of their contributions, plus a preferred return calculated at the rate of 10% per annum, "which shall constitute the only profit and loss percentage of [Claimants] in the [Debtor]."

Because Claimants are only entitled to a repayment of the contributions plus 10% and do not otherwise share in the profits and losses of the Debtor, Claimants asserts that their right to repayment of the contributions plus 10% is a debt obligation. The total amount owed as of November 24, 2019, including interest, is $3,972,571.76. To the extent the Bankruptcy Court determines that the right to repayment is an equity interest, this proof of claim should be deemed a proof of interest evidencing preferred equity.

Further, pursuant to Paragraph 4 of this Agreement, the Debtor agreed that "it will continue to diligently market the Property for sale pursuant to the existing sale listing agreement" and that LMR-TBH, LLC, in its capacity as Manager of the Debtor, will provide Claimants "with copies of all offers or letters of intent for the Property as they are received." The Debtor also agreed in April 2019 to amend the listing agreement with its brokers to reduce the listed price to $95,000,000 (the "2019 Addendum"). A copy of the 2019 Addendum is attached as Exhibit B. Claimants assert that the Debtor breached its obligations under Paragraph 4, the 2019 Addendum, and the duty of good faith by failing to diligently market the Property, failing to provide Claimants with timely copies of all offer and letters of intent, failing to reduce the listing price in accordance with the 2019 Addendum, and instructing its brokers to not comply with the 2019 Addendum. Claimants' claim based on these breaches is currently unliquidated.

Claimant reserves the right to amend or supplement this proof of claim at any time for any reason.

# EXHIBIT A

### AGREEMENT AND ADDENDUM TO SECOND AMENDED AND SECOND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF TBH19, LLC

THIS AGREEMENT AND ADDENDUM TO SECOND AMENDED AND SECOND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF TBH19, LLC (collectively "Agreement") is entered into as of this 21 day of November 2018 by and between TBH19, LLC, a Delaware limited liability company ("TBH"), Leonard M. Ross, as Trustee of the Leonard M. Ross Revocable Trust (u/d/t 12-20-85) (the "Original Member"), and HAR, LLC, a California limited liability company ("Investor Member"), LMR-TBH, LLC, a Delaware limited liability company ("Manager") on the following terms:

WHEREAS, TBH is governed by that certain Second Amended and Second Restated Limited Liability Company Agreement of TBH19, LLC, dated as of July __, 2018 (the "TBH19 LLC Agreement"). Initially capitalized terms not defined herein shall have the meaning set forth in the TBH19 LC Agreement.

WHEREAS, TBH is the owner of that certain real property and improvements located at 1011 ½ North Beverly Drive, Beverly Hills, Los Angeles County, Texas (the "Property"); and

WHEREAS, TBH has incurred first lien indebtedness secured by the Property with DBD Credit Funding, LLC, a Delaware limited liability company ("DBD"); and

WHEREAS, a Second Trust Deed exists on the Property in favor of Glorya Kaufman ("Kaufman") to secure certain guaranty payments;

WHEREAS, a Third Trust Deed exists on the Property in favor of HAR-BD, LLC ("HAR-BD") to secured indebtedness;

WHEREAS, Investor Member, and/or its affiliates have previously advanced funds to or on behalf of TBH in the amount of $1,888,199.00 ("Prior Advances") and are willing to advance certain additional funds for the payment of the DBD Loan Extension Fee, and certain quarterly debt service payments which will become owing to DBD in the future in the sole discretion of the Investor Member and upon the terms and conditions set forth in this Agreement; and

WHEREAS, Investor Member is willing to cause HAR-BD and Kaufman to forebear from any collection efforts in connection with debt service payments which will accrue and become owing to HAR-BD and Kaufman through and including June 20, 2019.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1.      Investor agrees from time to time to contribute funds to TBH in the form of capital contributions ("Investor Member Contributions") for payment of: (i) the DBD Loan Extension Fee, in the amount of $225,000.00 on or before November 21, 2018 for payment by November 22, 2018 at 2:00 p.m. Eastern Standard Time (the "Extension Fee"); (ii) the quarterly DBD debt service payment owed by the TBH, which will be due and payable on January 1, 2019, in the approximate amount of $750,000.00 (the "Q1 Payment"), (iii) and the quarterly DBD debt service owed by TBH, which will be owing and due and payable on April 1, 2019, in the approximate amount of $750,000.00 (the "Q2 Payment" and (iv) such other amounts as may be contributed by

1

Agreement and Addendum to Second Amended and Second Restated 11-21-2018

the Investor Member, Subject to the terms and conditions of this Agreement, such contributions will be made on a timely basis in order to allow TBH to timely pay the Extension Fee, the Q1 Payment, and the Q2 Payment, or, alternatively, in Investor Member's sole discretion, by wire transfer directly to DBD on or before such dates.

2.    Investor Member agrees to cause HAR-BD and Kaufman to forebear from any collection efforts in connection with debt service payments which will accrue and become owing to HAR-BD and Kaufman through and including June 20, 2019

3.    Any and all Investor Member Contributions as referenced herein, including the Prior Advances, shall be credited to a capital account for the benefit of Investor in TBH (the "Investor Member's Capital Account") and reflected on the Second Amended and Second Restated Limited Liability Company Agreement of TBH19, LLC ("SASR"), a copy of which is attached hereto as Exhibit A. Investor is hereby admitted as a Member of TBH, and shall be entitled to share in profits or losses and receive distributions from TBH only as set forth in paragraph 6 hereof.

4.    TBH agrees that it will continue to diligently market the Property for sale pursuant to the existing sale listing agreement, dated September 2018 between TBH and the brokers named therein, a copy of which has been previously provided to Investor Member (the "Listing Agreement"). The Manager agrees to provide the Investor Member with copies of all offers or letters of intent for the Property as they are received. THB and the Manager agree not to amend the terms of the Listing Agreement without the prior written consent of the Investor Member, which consent will not be unreasonably withheld.

5.    If the Property: (i) is not sold by TBH, or (ii) a binding written agreement to sell the Property entered into with a bona fide purchaser, who has made a non-refundable deposit (except in the event of seller default), a sale escrow opened, with all conditions to close satisfied, other than transfer of title, no later than March 31, 2019 time being of the essence, Investor Member shall have the right to conduct the sale of the Property on behalf of TBH, as its attorney-in-fact limited solely to the execution of a bona fide sale at the sale price specified below, and including the right to cause TBH to list the Property for sale with a broker chosen by the Investor Member, in addition to any other brokers chosen by TBH, and accept a bona fide purchaser offer to purchase the Property with a cash sale price of no less than $99,000,000.
$ 95,000,000

6.    TBH and the Manager (a) agree to fully cooperate in the sale of the Property and will not interfere or cause any delay with the marketing or sale of the Property as set forth in Section 4 above, including the minimum prices set forth therein; and (b) will abide by the provisions of the TBH19 LLC Agreement which are not in conflict with this Agreement, including, without limitation "ARTICLE XI PROVISIONS RELATING TO LOANS" as stated therein and Section 7.17 "Restrictions on Fundamental Changes" as stated therein.

7.    Upon the close of escrow for the sale of the Property, the net sales proceeds, after payment of all closing costs and commissions, shall be disbursed through escrow as follows:

a.    Payment in full of the indebtedness owed to DBD;

b.    Payment in full of the indebtedness owed to HAR-BD;

c.    Payment in full of all amounts owed Kauffman;

2
Agreement and Addendum to Second Amended and Second Restated 11-21-2018

    d.  Payment in full of the Investor Member Contributions, plus a Preferred Return thereon calculated at the rate of ten percent (10%) per annum (which shall constitute the only profit and loss percentage of Investor Member in the TBH);

    e.  Payment in full, including all accrued but unpaid interest, of the amounts owed by CHP related to the second trust deed loan on the property located at 1013 North Beverly Drive, Beverly Hills, California.; and

    f.  The balance to the Original Member.

    8.  Notwithstanding any provision of the TBH19 LLC Agreement to the contrary, a unanimous vote of the Members, including the Investor Member, shall be required for THB to: (i) take any action described in Sections 11.01(a)(xxix) and 11.01(a)(xxxi) of TBH19 LLC Agreement, including without limitation, the institution of any proceeding under the Bankruptcy Code, (ii) to take any action whose intent or likely result, is to hinder, delay, or in any way interfere with creditor's rights or the sale of the Property, (iii) make any distribution to its Members, or (iv) amend the terms of the TBH19 LLC Agreement.

    9.  The Manager shall cause all real property taxes and insurance on the Property to be timely paid.

    10.  All net revenues from the Property shall be retained by TBH and utilized for its operating and Property related expenses payments until June 30, 2018. Thereafter net revenues from the Property shall only be used to pay real property taxes, utilities, ordinary repairs and maintenance, and insurance on the Property, with the balance retained for amounts owed to DBD and HAR-BD. In no event shall net revenues from the Property be distributed to the Members of TBH.

    11.  In the event of any conflict between the terms of this Agreement and the TBH19 LLC Agreement, this Agreement shall control.

    12.  <u>Accredited Investor</u>: Investor Member represents that it qualifies as an Accredited Investor as that term is defined under Rule 501 of Regulation D Under the Securities Act of 1933, as amended.

    13.  <u>Miscellaneous:</u>

    a.  A telecopy or email transmission of a signed copy of this Agreement shall be deemed an original with the same force, effect and validity as an original. This Agreement may be signed in counterparts.

    b.  Investor Member, Original Member, TBH and CHP agree that this Agreement shall not be interpreted in favor of either party and it shall be deemed mutually negotiated.

    c.  TBH acknowledges and agrees that for purposes of this Agreement, Investor Member is not and shall not be deemed an affiliate of any lender to TBH.

3

Agreement and Addendum to Second Amended and Second Restated 11-21-2018

    d. This Agreement sets forth the entire understanding between the parties hereto and may not be altered except by another writing signed by all parties hereto. This Agreement shall be governed in accordance with the laws of the State of California and venue on any action hereunder shall be in the County of Los Angeles, California.

    e. This Agreement shall be maintained on a confidential basis by Investor Member.

    f. In the event that any term, covenant, or condition of this Agreement shall be held to be invalid, illegal or unenforceable, the Agreement shall be construed without such provision.

    g. Investor Member represents that the execution of this Agreement was not induced or procured through any other party acting as a broker or finder for which TBH shall be obligated for any fees or other payment.

    h. There are no third-party beneficiaries to this Agreement.

    i. In the event of any proceeding to interpret or enforce the terms of this Agreement, the prevailing party shall be awarded its reasonable attorney's fees and costs.

IN WITNESS WHEREOF, this Agreement is entered into on the day and year first above written.


TBH19, LLC                                    INVESTOR MEMBER:

By LMR-TBH, LLC, its Manager                  HAR, LLC

By: _____
    Leonard M. Ross, Manager                 By: _____

ORIGINAL MEMBER:

Leonard M. Ross,
as Trustee of
the Leonard M. Ross Revocable Trust (u/d/t
12-20-85)

_____
Leonard M. Ross

4

Agreement and Addendum to Second Amended and Second Restated 11-21-2018

# EXHIBIT B

Dear Harvey,

Enclosed is the May Price Addendum which you agreed will not be given nor disseminated to any Broker until on or after May 1, 2019. As discussed, we will talk on May 1, 2019 as to the status of sale or refinancing of the 1011 N. Beverly Drive property and if not sold or refinanced you will decide, in your discretion, whether and on what date the Price Addendum will become effective and submitted to the Brokers.

Thank you

Leonard Ross

1



**CALIFORNIA**
**ASSOCIATION**
**OF REALTORS®**

**MODIFICATION OF TERMS / ADDENDUM TO**
**AUTHORIZATION AND RIGHT TO SELL,**
**ACQUIRE OR RENT, OR**
**OTHER AGREEMENT BETWEEN PRINCIPAL AND BROKER**
(C.A.R. Form MT, Revised 4/13)

The ☒ Listing Agreement ☐ Buyer Representation Agreement, (or, if checked,) ☐ Other _____ dated
_April 1, 2019_ , between _____ Compass/ Coldwell Banker/Hilton & Hyland _____ ("Broker")
and _____ TBH19, LLC, a Delaware limited liability company, _____ ("Principal"), regarding the real
property, manufactured home or business described as _1011 N Beverly Dr, Beverly Hills, CA 90210-2328_

is modified as follows:

PRICE: The listing price, price range, lease or rental amount shall be changed to:
_Ninety-Five Million_
_____ Dollars ($ _95,000,000.00_ )

EXPIRATION DATE: The expiration date is changed to: _____

OTHER: _Price adjustment effective on May    , 2019._
_____
_____
_____
_____
_____

All other terms of the Listing Agreement, Buyer Representation Agreement, or other agreement as applicable, remain in full force and
effect, except as modified herein.

I acknowledge that I have read, understand and have received a copy of this Modification of Terms.

Date _1/1/19_ at _____, California

Principal _TBH19, LLC, a Delaware limited liability company_    Principal _____

Broker _Compass/ Coldwell Banker/Hilton & Hyland_    DRE Lic # _01866771_ _____ Date _____
        (Firm)
By _____    DRE Lic # _01296524_ _____ Date _____
        (Agent)
A. Kirman/ D. Fenton/ J. Mills/ L. May

© 2013, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form,
or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR
ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE
TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the
user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who
subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®.
525 South Virgil Avenue, Los Angeles, California 90020

MT REVISED 4/13 (PAGE 1 OF 1)
MODIFICATION / ADDENDUM AUTHORIZATION AND RIGHT TO SELL, ACQUIRE OR RENT (MT PAGE 1 OF 1)

JAG, 150 S. Rodeo Dr, Beverly Hills CA 90212        Phone: (310)272-3002        Fax: (310)247-1622        1011 N Beverly Dr
Aaron Kirman        Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 21700 Oxnard Street, Suite 1750, Woodland Hills, CA 91367.

A true and correct copy of the foregoing document entitled **MOTION FOR ORDER DISALLOWING CLAIM NO. 14-1 (HAR, LLC AND HARVEY BOOKSTEIN); DECLARATION OF LEONARD ROSS; REQUEST FOR PRESERVATION OF LIEN UNDER 11 U.S.C. SECTION 551; REQUEST FOR IMPOSITION OF ADVERSARY RULES; AND REQUEST OF DEBTOR FOR THE HOLDING OF A STATUS CONFERENCE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 24, 2020, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Alexis M Buese**    alexis.buese@sidley.com, vcordi@sidley.com;laefilingnotice@sidley.com;alexis-buese-3174@ecf.pacerpro.com
- **Thomas H Casey**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **J. Bennett Friedman**    jfriedman@flg-law.com, msobkowiak@flg-law.com;cllosa@flg-law.com
- **James Andrew Hinds**    jhinds@hindslawgroup.com, mduran@hindslawgroup.com
- **Daniel A Lev**    dlev@sulmeyerlaw.com, ccaldwell@sulmeyerlaw.com;dlev@ecf.inforuptcy.com
- **Kelly L Morrison**    kelly.l.morrison@usdoj.gov
- **Samuel A Newman**    sam.newman@sidley.com, samuel-newman-2492@ecf.pacerpro.com;laefilingnotice@sidley.com;ldixon@sidley.com
- **Aram Ordubegian**    ordubegian.aram@arentfox.com
- **Luan K Phan**    lphan@pblawgroupnet
- **Leonard Ross**    lross@rb-law.net, jestrada@rb-law.net
- **Eric B Schwartz**    eschwartz@sidley.com, laefilingnotice@sidley.com;eric-schwartz-1161@ecf.pacerpro.com;lruiz@sidley.com
- **David B Shemano**    dshemano@shemanolaw.com
- **Jonathan Seligmann Shenson**    jshenson@shensonlawgroup.com
- **Rachel M Sposato**    rsposato@hindslawgroup.com, mduran@hindslawgroup.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Genevieve G Weiner**    gweiner@sidley.com, laefilingnotice@sidley.com;genevieve-weiner-0813@ecf.pacerpro.com
- **Christopher K.S. Wong**    christopher.wong@arentfox.com, yvonne.li@arentfox.com
- **Robert M Yaspan**    court@yaspanlaw.com, tmenachian@yaspanlaw.com

2. **SERVED BY UNITED STATES MAIL**:
On July 24, 2020, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.


Honorable Vincent P. Zurzolo
United States Bankruptcy Court
255 E. Temple Street, Suite 1360 / Courtroom 1368
Los Angeles, CA 90012

HAR, LLC
Harvey Bookstein
11766 Wilshire Blvd. 9th Floor
Los Angeles CA 90025

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hahn Fife & Company
donfife@hahnfife.com


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


| July 24, 2020 | Tatyana Menachian | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**